In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1348

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOHN ERIC SIMS,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-20051—**Michael P. McCuskey**, *Chief Judge*.

ARGUED DECEMBER 17, 2008—DECIDED JANUARY 22, 2009

Before BAUER, POSNER, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant, convicted of
illegal possession of a gun and sentenced to 30 months in
prison, challenges the constitutionality of the search that
discovered the gun. He argues that the warrant that
authorized it failed to specify with particularity the
things the searchers were looking for and therefore vio-
lated the Fourth Amendment. He is right that there was
a violation but wrong that it invalidates his conviction.

Local police, having reason to believe that there was stolen property in a house (or its garage, or vehicles on the property) occupied by the defendant, presented to a state court judge an application for a search warrant together with an affidavit in support of the application and a draft warrant materially identical to the application. The affidavit listed the stolen goods believed to be on the property as "several items which included a black in color gas grill with the brand name Aussie, a yellow in color welder with 'multi-mig' written on the side, a cutting torch with Hobart gauges and chrome in color snap on brand tools with initials GAG engraved." But the list was left out of the application and the draft warrant. The omissions apparently were inadvertent, because after specifying the places to be searched these documents state: "Or any other evidence indicative of a criminal offense of Burglary, Theft or Possession of Stolen Property." Probably the drafter of the warrant intended to list before "or any other evidence . . ." the items listed in the affidavit. Perhaps not noticing the omissions, the judge signed the draft warrant and so it was issued and the search conducted accordingly; and it was in the course of the search that the illegal gun was discovered in a bag in the house. Since the bag was large enough to have contained tools that the police were looking for, they were entitled to look inside it and seize any contraband or evidence of crime visible to someone looking inside. E.g., *United States v. Eschweiler*, 735 F.2d 435, 440 (7th Cir. 1984).

The Fourth Amendment states that "the right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The requirement of particular description is conventionally explained as being intended to protect against "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). But it also serves to prevent circumvention of the requirement of probable cause, see *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987); *Andresen v. Maryland*, 427 U.S. 463, 480 (1976), by limiting the discretion of officers executing a warrant to determine the permissible scope of their search. Thomas Y. Davies, "Recovering the Original Fourth Amendment," 98 *Michigan Law Review* 547, 576-83 (1999). There might be probable cause to believe that a house was a drug house though not to believe that it contained counterfeit money. But the police might have suspicion short of probable cause for the latter belief and their main aim in searching might be to seize counterfeit money rather than drugs. If probable cause to search for drugs allowed them to search for counterfeit money as well—even if they had already found the drugs—they could conduct *that* search on the basis of mere suspicion, without probable cause. Or suppose they had probable cause to believe that there was a stolen car on the defendant's property, but in the absence of any specification of the object of the search took the opportunity to search every drawer and other receptacle on the property on the off chance they would find drugs, though they had no

probable cause to believe they would. In both cases, unlike a case in which officers simply have a dual motive, see *Whren v. United States*, 517 U.S. 806, 812-13 (1996), the requirement of particular description of the things to be seized in the search would bar a search that was not based on probable cause—in our examples, the search for counterfeit money.

The warrant in this case lacked a particular description of the things to be seized (if found). Nor did it incorporate by reference the description in the warrant affidavit; incorporation by reference would have sufficed. *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2008); *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir. 1999). Yet as an original matter the defect in the warrant might not condemn the search itself. The Fourth Amendment, read literally at any rate, does not require warrants; it merely restricts them. It does not forbid searches without warrants; it merely forbids unreasonable searches. "There is nothing in the amendment's text to suggest that a warrant is required in order to make a search or seizure reasonable. All that the amendment says about warrants is that they must describe with particularity the object of the search or seizure and must be supported both by an oath or affirmation and by probable cause, which is understood, in the case of searches incident to criminal investigations, to mean probable cause that the search will turn up contraband or evidence of crime." *United States v. Garcia*, 474 F.3d 994, 996 (7th Cir. 2007). "[T]he framers of the Fourth Amendment were more fearful that the warrant would protect the police from the citizen's tort suit through operation of the doctrine of

official immunity than hopeful that the warrant would protect the citizen against the police, see [Telford] Taylor, *Two Studies in Constitutional Interpretation* 23-43 (1969)." *United States v. Mazzone*, 782 F.2d 757, 759 (7th Cir. 1986). See also *Payton v. New York*, 445 U.S. 573, 607-14 (1980) (dissenting opinion); *United States v. Limares*, 269 F.3d 794, 799 (7th Cir. 2001) ("the fourth amendment does not of its own force require a warrant for any search. Its text is a *limitation* on warrants . . . stemming from dissatisfaction with the use of warrants by the crown courts during colonial days") (emphasis in original); Akhil Reed *Amar, The Constitution and Criminal Procedure: First Principles* 3-17, 40-43 (1997).

Against this, Professor Davies argues that despite its wording, the only purpose of the Fourth Amendment was to outlaw general warrants, but that the framers, reluctant to recognize any discretion in law-enforcement officers, thought that searches of a home would require a warrant (a specific warrant, that is). Davies, *supra*, at 715-24; see also *Payton v. New York*, 445 U.S. 573, 596 (1980). But whether Davies and the majority in *Payton* are right, or Telford and Amar and the dissenters in *Payton*, a search for which a valid warrant could *not* be obtained, because the police did not have probable cause to search, or to search in all the places, or search for all the things, that they wanted to search in or for, would be unreasonable. The requirements that the constitutional text imposes on warrants define the circumstances that make a search unreasonable. It would not do to allow a judicial officer to issue a search warrant without

probable cause but a police officer to conduct a search without either a warrant or probable cause. In the present case, however, the police conducted exactly the same search that they would have conducted had the warrant described with the requisite particularity the things they were searching for. Nor is it remotely likely that the state judge would have refused to sign the warrant had it complied with the Fourth Amendment by listing those things.

So just as in *United States v. Stefonek*, 179 F.3d 1030 (7th Cir. 1999), a case that differs in no material respect from this one, the search was reasonable. But we could not there, and we cannot here, draw the straightforward conclusion that there was no violation of the Fourth Amendment. The Supreme Court, on grounds of policy rather than of text or history—in fact, as we have just noted, in the teeth of the text and possibly of the history of the amendment (depending on whether Taylor or Amar, on the one hand, or Davies on the other, has the better historical case)—has ruled that, though with numerous but immaterial exceptions, a search without a warrant is unconstitutional. (For both the rule and the exceptions, see, e.g., *Brigham City v. Stuart*, 547 U.S. 398, 403 (2008).) The policy is that of reducing the number of unreasonable searches by requiring that a presumably neutral judicial officer screen police searches. E.g., *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (Jackson, J.). "[A]nd although the effective neutrality and inde- pendence of magistrates in ex parte proceedings for the issuance of search warrants may be doubted, there is a practical reason for requiring warrants where feasible: it

forces the police to make a record before the search, rather than allowing them to conduct the search without prior investigation in the expectation that if the search is fruitful a rationalization for it will not be difficult to construct, working backwards." *United States v. Mazzone, supra*, 782 F.2d at 759.

Even so, it would not follow that in cases such as this, in which the judicial screening had failed to prevent the search (although it certainly succeeded in creating a written record), the fruits of the search should be suppressed at the defendant's trial. A person whose rights have been violated by a search can be remitted to a suit against the police for committing a constitutional tort. Now that such suits are common and effective, *United States v. Langford*, 314 F.3d 892, 895 (7th Cir. 2002), the exclusionary rule is bound some day to give way to them. For the rule is too strict: illegally seized evidence essential to convicting the defendant of a grave crime might have to be suppressed, and the criminal let go to continue his career of criminality, even if the harm inflicted by the illegal search to the interests intended to be protected by the Fourth Amendment was slight in comparison to the harm to society of letting the defendant off scot free.

Concerned with such anomalies though unwilling as yet to abrogate the exclusionary rule (although it has no constitutional basis—it is a doctrine of federal common law), the Supreme Court has in the name of "inevitable discovery" created an exception to the rule for cases like this in which the harm caused by an illegal search to

the values protected by the Fourth Amendment is not merely slight in relation to the social benefits of the search, but zero. It is zero because, as in *United States v. Stefonek*, *supra*, 179 F.3d at 1033-34, had the police complied with the Fourth Amendment the consequences for the defendant would have been exactly the same as they were. The search would have been authorized, would have taken place, and would have been identical in scope, both as to places searched and things seized, to the search that the police did conduct. The defendant would have been no better off had the warrant complied with the Fourth Amendment. Cf. *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008).

In *Stefonek* we considered but rejected the possibility that we had "overlooked another purpose of the requirement of particularity, that of informing the person whose premises are to be searched of the scope of the search, so that he . . . can monitor the search while it is being conducted and make sure it stays within bounds." *Id*. at 1034. As we pointed out, nothing in the amendment requires that the warrant be shown to the person whose premises are to be searched. As a matter of prudence, police will show a search warrant to the person whose premises are to be searched if he questions their authority to conduct the search. But they do not have to. E.g., *United States v. Grubbs*, 547 U.S. 90, 98-99 (2006); *Groh v. Ramirez*, *supra*, 540 U.S. at 562 n. 5; *United States v. Cazares-Olivas*, 515 F.3d 726, 729 (7th Cir. 2008); see Fed. R. Crim. P. 41(f). This is shown by the fact that they are not required to wait until someone is at home to conduct the search. E.g., *United States v. Stefonek*, *supra*, 179 F.3d at 1034; *United States v.*

*Chubbuck*, 32 F.3d 1458, 1460-61 (10th Cir. 1994). The Constitution does not give property owners a "license to engage the police in a debate over the basis for the warrant." *United States v. Grubbs*, *supra*, 547 U.S. at 98-99.

But we must reconsider our analysis in light of the Supreme Court's decision in *Groh v. Ramirez*, *supra*, decided after *Stefonek* though before *Grubbs*. In the course of holding that a search pursuant to a warrant that as in this case failed to describe the things to be seized with the required particularity even though (as in this case) the warrant affidavit contained an adequate description, the Court quoted with approval the statement in an earlier case that the requirement of particular description "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." 540 U.S. at 561, quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977). That may be a benefit of serving a warrant, but, as we have noted, service is not required. Illinois law requires that a copy of the warrant be given the person whose property is searched if he is present (otherwise it is to be left at the place where the search takes place), 725 ILCS 5/108-6, but state law does not define federal constitutional requirements. *Virginia v. Moore*, 128 S. Ct. 1598 (2008); *United States v. Quintanilla*, 218 F.3d 674, 678-79 (7th Cir. 2000).

*Groh* was a tort case, moreover, not a criminal case. There was no question of excluding illegally seized evidence, hence no concern that the sanction for violating the Fourth Amendment would be disproportionate to the

harm caused by the violation. If the plaintiffs in *Groh* could not prove harm, they would get no damages, rather than escaping punishment for a crime—they were never charged with having committed a crime. We do not think that the fact that our defendant might have obtained some slight psychological benefit from being able to monitor the police search had the police shown him a warrant that described the things they were looking for takes this case out of reach of the "inevitable discovery" doctrine (we might call it the no harm, no foul, doctrine). As we explained in *United States v. Cazares-Olivas*, *supra*, 515 F.3d at 728-29, "permitting people to get away with crime is too high a price to pay for errors that . . . do not play any causal role in the seizure (the inevitable-discovery situation) . . . . *Groh* was a suit for damages; we doubt that the Court would have invoked the exclusionary rule when a description of the things to be seized, though missing from the warrant, appeared in an affidavit that was filed with the court in support of the application and was respected when the search occurred. The inevitable-discovery doctrine, if nothing else, would have foreclosed use of the exclusionary rule in *Groh*."

AFFIRMED.