In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2172

MAIRA GUZMAN,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, a municipal corporation,
MARVIN BONNSTETTER, Chicago Police Officers,
Star 1645 and DANILO ROJAS,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6617—**Blanche M. Manning,** *Judge.*

ARGUED FEBRUARY 13, 2009—DECIDED MAY 13, 2009

Before KANNE, ROVNER, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* In this case brought under 42 U.S.C. § 1983, Maira Guzman alleges that her constitutional rights were violated when Chicago police officers performed an unreasonable search of her home, placed her under arrest, and used excessive force against her. She also sets out various state law violations. The district court granted summary judgment dismissing her

claims; Guzman appeals only the dismissal of those relating to the alleged unlawful search and her claim of false arrest.

In 2005, Sergeant Marvin Bonnstetter of the Chicago Police Department was investigating gang activity. In the course of the investigation he went to the Cook County jail where he met with an inmate. Another inmate, referred to as John Doe, approached Bonnstetter and said he had information about gang activity that he wished to share with the police. Bonnstetter did not know the aspiring informant but told him to call after he was released from jail. And call he did, six months later. Then the two met at a police station, along with a special agent from the Federal Bureau of Investigation, James McDonald. Doe, who himself was a gang member and a convicted felon, discussed his knowledge of gangs. It was information which coincided with other knowledge and convinced Bonnstetter and McDonald that Doe was reliable. In addition, Doe positively identified pictures of 10 to 20 gang members from photos he was shown.

One of the specific bits of information Doe provided was that he saw a gang member and convicted felon named Ruben Estrada, whom he had known for years, at a single-family residence at 1536 West Walton in Chicago. Doe said Estrada lived in the house with his family. Doe also said that he saw Estrada enter the two-story dwelling through one door on the first floor and exit with a handgun from another door on the first floor. Doe said Estrada had a handgun for protection because his gang was at war.

Agent McDonald and Doe drove by the house on West Walton and Doe confirmed that it was where he saw Estrada. As they were driving by the house, McDonald saw "a small real estate sign" in the front window. To him, the building looked like a single-family residence and he assumed that someone was running a real estate business out of the home. McDonald conveyed this information to Bonnstetter, who then searched a police database which showed that Estrada gave 1536 West Walton as his address to the police five times from 1997 to 2001. The database also showed that after 2001 he used as his address 1538 and 1636 West Walton, 1515 West Cortez, and 2943 North Ridgeway. Apparently having regular run-ins with the police, Estrada used the latter address eight times from 2002 to 2005. In other words, it had been almost four years since Estrada used the 1536 West Walton address in his many contacts with the police.

Nevertheless, armed with the information that Estrada was connected with 1536 West Walton, Bonnstetter signed an affidavit requesting a warrant to search Estrada—a felon who was then on bond for unauthorized use of a weapon—and to search 1536 West Walton, which was described as a single-family residence. A Cook County circuit court judge found that the affidavit provided probable cause and issued a warrant authorizing the search of Estrada's person and of 1536 West Walton, a "single family residence," and the seizure of any handgun as well as proof that Estrada lived in the house.

Armed with the warrant, Bonnstetter, McDonald, and some seven other Chicago police officers as well as seven

FBI agents descended on 1536 West Walton. When he arrived, Bonnstetter saw the real estate sign; like McDonald, he thought it looked like a home business. What he also saw, though, was that the front of the building had two doors, one leading to the business and the other to a stairway up to the second floor. The back of the building also had two doors.

What became clear at some point is that the building was not a single-family residence, but rather it housed a real estate office, an apartment (though unoccupied as it turned out) on the first floor, and a separate apartment on the second floor. It is unclear whether there were real estate flyers in the front window of the office and whether a mailbox on the door to the upstairs was labeled Guzman family.

On that morning, Guzman, who lived in the second-floor apartment with her husband, was at home, undressed, lying on her bed talking on her phone, when she heard knocking at her door. She put on a long, loose-fitting T-shirt and walked toward the door. Suddenly, the door was forced open with a crowbar and officers entered the apartment with guns drawn. Guzman did not speak English but she understood a gesture made by one of the officers to mean that she should lie down on the floor. Realizing that Guzman did not speak English, Officer Danilo Rojas began to serve as an interpreter. Guzman, who was seven months pregnant at the time, remained on the floor, in what she said was an uncomfortable position, for about 10 minutes. After the officers completed a security check of the apartment, she was permitted to

get up, put on pants, and sit on a chair. The officers proceeded to search her apartment. Guzman told the officers that she did not know Estrada, that he did not live in her apartment, and that there was no handgun. After 30 minutes of searching, finding nothing of interest in the apartment, the officers left. As a result of the entire episode, all that was found was an inoperable, rusty handgun in the search of the backyard. The officers also admitted observing that the first-floor apartment was under renovation and unoccupied.

As the officers were leaving, Guzman's husband arrived home. Guzman, who was by then feeling pain in her abdomen, wanted to see her doctor. Because her doctor was unavailable, Guzman went to a nearby hospital where she was kept overnight for observation.

As a result of the incorrect information in the warrant application, Bonnstetter decided not to execute a second search warrant he had obtained, also based on information provided by Doe. Bonnstetter testified in his deposition that about a week after the search he had a conversation with Doe in which he told him "the information he gave me wasn't right and I was upset." He also said he "was upset to the point that if he told me that it was a residence on the first floor and I go in there and it's an office building, I was upset about that."

Guzman brought this lawsuit, seeking damages for the alleged illegal search as well as other claims. The district court granted summary judgment to the defendants. Our review is *de novo*. *Bell v. Duperrault*, 367 F.3d 703 (7th Cir. 2004).

In evaluating an alleged violation of the Warrant Clause of the Fourth Amendment, we look at two distinct aspects of the warrant—its issuance and its execution. *Maryland v. Garrison*, 480 U.S. 79 (1987). We will turn first to the issuance of the warrant.

The Fourth Amendment requires that a warrant be supported by probable cause and that it describe, with particularity, the place to be searched and the items or persons to be seized. Absent exigent circumstances, a neutral magistrate must make the probable-cause determination and issue the warrant. *Chambers v. Maroney*, 399 U.S. 42 (1970); *Jones v. Wilhelm*, 425 F.3d 455 (7th Cir. 2005).

Obviously, in this case the information provided to the judge—i.e., that 1536 West Walton was a single-family house and that Estrada lived there—was not accurate. However, we do not view probable cause determinations with hindsight. Rather, the validity of the warrant is assessed on the basis of the "information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Garrison*, 480 U.S. at 85. Information that emerges after the warrant is issued has no bearing on this analysis.

In this case, Bonnstetter and McDonald talked with Doe to assess his reliability. The information about gang activity coincided with their own. They also showed him pictures of gang members and he was able to identify them. McDonald took Doe to West Walton to look at the house. McDonald observed what he thought was a single-family house with a home business. Despite these precautions, Guzman argues that they should have done

more—that they should have told the judge that this was the first time Doe had provided information so they were limited in their assessment of his reliability. We doubt that would have made a difference. At the beginning of his work with the police, every informant necessarily provides information for the first time. We are convinced that the steps taken to verify the information Doe provided were sufficient. There was probable cause to issue the warrant.

Our conclusion is in line with prior cases. In *Jones* we found a warrant to be valid when it was issued despite a finding that the police were not diligent in ensuring that the name of the tenant and the apartment number were on the warrant. Also, in a situation similar to the one before us now, we upheld a search warrant on the basis that the police investigation did not suggest that the house involved was not a single-family residence but rather a multiunit, multipurpose building, which also housed a barber shop. *United States v. White*, 416 F.3d 634 (7th Cir. 2005).

That the warrant be properly issued, however, is only half of what the Fourth Amendment requires. The warrant must also be properly executed. A warrant cannot be executed by persons who know it to be ambiguous. *Garrison*; *Jones*; and *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000). It is not uncommon for problems to arise—as in this case—because of the existence of multiple living units in what is thought to be a single-family residence, or when it is clear that multiple units exist but the warrant fails to identify with precision which unit is to be searched.

In *Garrison*, officers had a warrant to search the third-floor apartment of someone named Lawrence McWebb. On their way to perform the search they encountered McWebb in front of the apartment building. He let them in and they proceeded to a vestibule on the third floor with two doors opening off it. Garrison was standing in the hallway. The Court found that only after they searched Garrison's apartment did the officers realize that it was not McWebb's and that in fact there were two apartments, not one, on the third floor. As soon as they discovered their mistake, they were required to discontinue the search of Garrison's apartment. Unfortunately for Mr. Garrison, that happened *after* heroin, cash, and drug paraphernalia were found.

In *Jacobs*, police obtained a warrant for a "single family residence" and for a person named Troy. The information on which the warrant was based was obtained by an informant who said a large amount of cocaine was being sold out of the building. In fact there were three apartments in the building, as the police were informed by the building owner immediately upon their arrival. The owner, who lived on the first floor, also told the officers there was no one named Troy in the building. She said that someone named Jacobs, who was ill, lived in an upstairs apartment. Undeterred, officers went to the side entrance to apartment # 2 and broke down the door without knocking or announcing that they were police officers. Officers approached Jacobs, a 60-year-old sickly man, and pointed a gun at his head. While the officer kept a gun to Jacobs' head for 10 minutes, they performed a preliminary search of his apartment. The

entire search continued for three hours, during which time the officers called in a drug-sniffing dog. Still no drugs were found. We determined that reasonable officers should have known before entering Jacobs' apartment that the building was not a single-family residence and thus the warrant was overly broad. Once they discovered the mistake, the officers should have discontinued the search.

*Jones* presents an interesting, but not difficult, problem of interpretation. The warrant allowed a search of "the upstairs apartment on the right" at a certain address. An officer conducting the search knew from earlier surveillance that the building contained two staircases. He knew that if he took the back staircase the "upstairs apartment on the right" would lead him to the Joneses' apartment, and if he took the front staircase the apartment on the right would be a different unit. In response to this sleight of hand, we said that "[w]here a warrant is open to more than one interpretation, the warrant is ambiguous and invalid on its face and, therefore, cannot be legally executed by a person who knows the warrant to be ambiguous." 425 F.3d at 463.

Our case today is relatively straightforward. Although the officers thought the building looked like a single-family house, they should have known pretty quickly that their belief was mistaken. They learned that the front of the building housed a real estate office. That the office was small does not distract from the fact that it was an office. Officers also learned that they could not get to the rest of the house from that office. That they had to go

outside to access the second-floor apartment should have informed them that this was not a single-family residence. They also knew there was a separate door for the first-floor apartment. So informed, they should have called off the search. As we said in *Jacobs*, "searching two or more apartments in the same building is no different than searching two or more completely separate houses." 215 F.3d at 767. Furthermore, Sergeant Bonnstetter acknowledged that the officers were not under time pressure to execute the warrant, as no easily disposed of drugs were involved. Rather, they were looking for a handgun.

Admittedly, the facts before us are not so egregious as in *Jacobs* or *Jones*. But as was true in those cases, Bonnstetter should have known early on that the warrant did not accurately describe the premises to be searched. Once he knew that the house was not a single-family dwelling, he should have called off the search. Not doing so violated Guzman's constitutional rights.

Interestingly, as this is a case for damages under § 1983, it may illustrate our recent observation that in some ways it is easier to protect Fourth Amendment rights though civil actions, rather than through the suppression of evidence in criminal cases. In *United States v. Sims*, 553 F.3d 580 (7th Cir. 2009), we wondered whether at some point the Supreme Court will approach civil cases differently from criminal cases because to find a violation in a civil case raises "no concern that the sanction for violating the Fourth Amendment would be disproportionate to the harm caused by the violation." *Id.* at 585. Just a few months ago in *Herring v. United States*, 129 S. Ct. 695, 700

(2009), the Court reiterated the distinction between the existence of a Fourth Amendment violation and a subsequent invocation of the exclusionary rule, noting that exclusion "has always been our last resort, not our first impulse . . . ." (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Exclusion is not a necessary consequence of a Fourth Amendment violation, and the benefits of exclusion must outweigh the costs.[1] *Herring*, 129 S. Ct. at 700.

---

[1] Those "costs" are often on the minds of some judges evaluating suppression motions. They account for the myriad of doctrines employed to avoid the suppression of evidence. These include the standing-related doctrine which limits the persons who have a reasonable expectation of privacy in the area searched. *Rakas v. Illinois*, 439 U.S. 128 (1978). Then there is the inevitable discovery doctrine, *Nix v. Williams*, 467 U.S. 431 (1984), as well as good-faith exceptions. *United States v. Leon,* 468 U.S. 897 (1984). And of course many others—the exigent circumstances exception to the warrant requirement, *Brigham City v. Stuart*, 547 U.S. 398 (2006), and such things like finding a "consent" to search based on "apparent authority," *United States v. Matlock,* 415 U.S. 164 (1974). Furthermore, of course, there is the deference given to the probable-cause findings of the magistrate issuing the warrant, *Illinois v. Gates*, 462 U.S. 213 (1983), and, in the case of warrantless searches, the "due weight" given to the inferences drawn by law enforcement officers. *Ornelas v. United States*, 517 U.S. 690 (1996). Additionally, there is the holding in *Herring* that the exclusionary rule should not apply in a situation involving a search incident to an arrest made on the mistaken belief that there was an outstanding arrest warrant for the person searched.

(continued...)

These "costs" to law enforcement are not a concern in civil cases. For that reason, civil cases are far less troublesome. As we said in *Sims*, civil cases—like our case today—do not raise concerns that

> illegally seized evidence essential to convicting the defendant of a grave crime might have to be suppressed, and the criminal let go to continue his career of criminality, even if the harm inflicted by the illegal search to the interests intended to be protected by the Fourth Amendment was slight in comparison to the harm to society of letting the defendant off scot free.

553 F.3d at 584. This is not to say that the exclusionary rule is necessarily on life support. Just a few days ago, the Court overruled prior precedent regarding warrantless searches of automobiles incident to an arrest. The Court held that once an arrestee is safely in custody (he was under arrest, handcuffed, and in a squad car) and unable to gain access to his vehicle, the search of the vehicle "incident to arrest" doctrine is no longer available. *Arizona v. Gant*, 2009 WL 1045962, ___ S. Ct. ___ (2009).

Civil suits under § 1983 may not always be adequate to remedy a Fourth Amendment violation, which is of

---

[1] (...continued)

It is also interesting to note that the vast majority of suppression motions based on alleged Fourth Amendment violations are heard by state court judges, and their decisions not to grant the motions are immune from review by lower federal courts in habeas cases. *See Stone v. Powell*, 428 U.S. 465 (1976).

concern to many, including the dissenters in *Herring*. Officers, they say, will often be "sheltered by qualified immunity." That is true in some cases just as it is true that the many exceptions to the exclusionary rule often prevent vindication of Fourth Amendment rights.

In the present case, we think there is no question that the search was illegal and there is no issue of qualified immunity—that is, no issue that somehow the fact that the officers did not have a right to enter Guzman's apartment was not clearly established. So a civil case vindicates Guzman's Fourth Amendment rights. There was no contraband found and therefore no criminal case. But one might wonder whether Ms. Guzman's Fourth Amendment rights would have been vindicated if the officers had found the dead body of a child in the apartment and the case was referred to Cook County circuit court for prosecution. Would the exclusionary rule have been invoked? Or would the officers have been found to be acting in good-faith reliance on the warrant? Or would the temptation be great to find that some other exceptions to suppression should be invoked?

Finding that the execution of the search of the apartment was illegal, we will also reinstate Ms. Guzman's false arrest claim.

Accordingly, the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART and REMANDED for proceedings consistent with this opinion.

ROVNER, *Circuit Judge*, concurring.  I concur in the holding and the reasoning of the majority's thorough opinion, but I cannot concur in the substantial *dicta* devoted to attacking the exclusionary rule.  This is a civil case; nothing incriminating was discovered during this illegal search, and no criminal charges ensued.  There is thus nothing to exclude.  The continued vitality of the exclusionary rule is a matter solely for the Supreme Court to consider. It is a far-reaching issue that would benefit from full argument, and should not be blithely dismissed absent that full presentation. Because it is not our province to comment on issues not before the court, I do not join that part of the majority's opinion.  *See Idris v. City of Chicago, Ill.*, 552 F.3d 564, 567 (7th Cir. 2009). ("federal courts do not issue advisory opinions on situations that do not affect the litigants").