In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1241

WILHELM I. WADE and SE'MONE M. WADE,

*Plaintiffs-Appellants,*

*v.*

IVAN I. RAMOS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 9022 — **Rebecca R. Pallmeyer**, *Chief Judge.*

ARGUED OCTOBER 25, 2021 — DECIDED FEBRUARY 17, 2022

Before EASTERBROOK, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After Chicago police subjected Wilhelm Wade and his daughter, Se'Mone, to an invasive home search, the Wades sued. All agree that the officers who executed the search wound up in the Wades' second-floor apartment by mistake. But the Wades and the officers disagree about how reasonable the mistake was, how it came about, and when the officers should have realized they were in the wrong unit. The officers moved for summary judg-

ment. Although the district court expressed some reservations, in the end it granted the motion. The Wades appealed. We agree with the district court that the Wades have not pointed to evidence that would allow a reasonable factfinder to decide in their favor, and so we affirm.

**I**

Like many Chicagoans, the Wades live in an apartment building that has two floors; theirs is on the second floor. As in many such buildings, the first-floor unit in the Wades' building is a short flight of stairs up from ground level. Another full flight of stairs leads to the second floor. On the day of the search, Chicago Police Department (CPD) officers were seeking Terrell "Swami" Johnson, a purported heroin dealer. A confidential informant, John Doe, had identified the "second floor" of the Wades' building as Johnson's place of operations. The officers obtained a warrant for the second-floor unit, ascended both the short and the full-length staircases, and kicked in the door to the Wades' unit. That was a mistake. Doe apparently had identified the unit just a few steps above ground level as the "second" floor. That was where Johnson lived and had been running his drug business.

Doe was a so-called "registered cooperating individual" who had provided the CPD with information about drug sales on hundreds of occasions. At least two of the defendants here, Officer John Frano and Sergeant Ivan Ramos, knew Doe well from such encounters. According to Ramos, Doe's tips had resulted in many prior arrests. That is why, when Doe told Ramos in September 2015 that he had just purchased a few bags of heroin from a man known as "Swami," Ramos took an immediate interest. Doe recounted

that he had entered Swami's *second*-floor apartment through the front door, walked through a living room, and purchased heroin in the back bedroom. He claimed to have seen between twenty and fifty baggies of heroin in the bedroom closet. After hearing Doe's story, Ramos drove with him to the address Doe gave him—the Wades' building—where Doe pointed out the (real) second-floor unit—the Wades' apartment—and said it was Johnson's.

Ramos did very little to corroborate Doe's tip. He pulled a photograph of Terrell Johnson from the CPDs Data Warehouse and showed it to Doe, who indicated that the man pictured was "Swami." Neither Ramos nor any other officer took steps to confirm Johnson's address, surveilled the building further, or checked whether anybody else was registered as living in the unit in question.

Ramos drafted a search-warrant application for the second-floor unit. Ramos and Frano then applied for a warrant from a Cook County judge. The officers furnished the judge with the application, a draft warrant, and Doe's criminal history. The judge also interviewed Doe, who answered several questions about his knowledge of Johnson, his own heroin use, the date of the purchase from Johnson, and the quantity of drugs purchased. The record is silent as to whether the judge was told that Doe was a registered informant, but the Wades contend he was not and the officers do not claim otherwise. After the judge issued the warrant, Ramos, Frano, and ten other officers made plans to execute it that same evening.

Meanwhile, at the Wades' apartment, Wilhelm was visiting with his friend Tirae Dotson. Dotson often cut Wilhelm's hair and had agreed to do so that night. At around 8 pm, af-

ter chatting for a bit with Dotson, Wilhelm left to pick up
Se'Mone from a CTA station. The plan was for Dotson to cut
Wilhelm's hair after Wilhelm and Se'Mone returned. In-
stead, while Wilhelm was out, the police arrived. Their ac-
counts and Dotson's differ as to what happened next. Be-
cause the Wades, the nonmovants, have adopted Dotson's
version of the facts, we credit his account to the extent that it
differs from that of the officers. (Dotson was initially a party
to this lawsuit, but his claims have now been settled and are
not part of the appeal.)

Dotson was on the back porch smoking a cigarette when
the officers arrived on the scene. Before he saw anything,
Dotson heard two loud "thuds" or "booms" that sounded to
him as though they were coming from downstairs. The
booms were quickly followed by two officers chasing a man
named Pierre Nero up the rear stairs leading to the porch.
Dotson testified that he was not sure whether Nero was
coming from the downstairs apartment or from somewhere
else. The officers detained Nero (who turned out later to be
one of Johnson's associates) and Dotson on the porch. The
officers then moved both men to the Wades' kitchen and
searched them. Dotson alleged that an officer planted narcot-
ics on his person around this time.

All agree that shortly after the officers arrived at the
building, they also entered the downstairs unit. But there are
important differences in the details.

Although we do not rely on the officers' version, it sheds
some light on the overall scene. The officers say that upon
entering the Wades' apartment they found Dotson and Nero
inside. Both fled. Several officers pursued and soon caught
up with Dotson and Nero on the back porch. There they saw

a third man running down the stairs. Officer Frano pursued the third man, following him into the first-floor unit. Inside he found a woman, several children, and narcotics in plain view. Mysteriously, the man had vanished. The woman identified the man as Johnson and herself as his girlfriend.

This flatly contradicts Dotson's account, which, as we said, we are crediting at this juncture. Recall that Dotson said that he was on the porch, not inside, when he first encountered the officers, and he said that the officers chased Nero *up* the stairs, not the disappearing Johnson *down* the stairs. Dotson also testified that he has a necrotic hip and could not possibly have fled out onto the back porch. The Wades, emphasizing these disagreements, urge us to infer that the officers realized "immediately" that the warrant identified the wrong apartment. They further infer that the two booms Dotson heard were the officers breaching the downstairs door. We will return to these points later.

The Wades returned from the CTA station while the search of their home was ongoing, but the record does not pinpoint exactly when. Nor does it shed light on how long, after the Wades arrived, the officers remained in their apartment; whether the Wades managed to communicate to the supervising officers that they, not Johnson, lived in the second-floor unit; or how much information passed back and forth between the upstairs and downstairs teams. Video evidence that might have resolved some of these questions was, unfortunately, lost—the officers seized the video recording made by the building's surveillance-system, but then they purportedly mislabeled it. The officers now represent that it has been destroyed. (The plaintiffs did not assert that this loss amounted to spoliation of evidence, nor did

they seek an adverse inference or damages because of it. We therefore do not pursue those possibilities.) But putting aside the many holes in the record, we can say confidently that a thorough search of the Wades' apartment turned up no drugs. In contrast, large quantities of narcotics were discovered in the downstairs unit.

The Wades and Dotson sued. As relevant to this appeal, the Wades alleged that the officers violated their Fourth Amendment right to be free from unreasonable searches in two ways. First, they contended that the warrant was not supported by probable cause, in part because Ramos knowingly omitted material information from the warrant application. Second, they contended that the officers knew or should have known that their warrant described the wrong apartment but nonetheless continued the search.

The district court granted summary judgment to the officers on the Wades' claims. After Dotson's claims were settled, the Wades appealed.

## II

At the outset, we must address an evidentiary dispute. The Wades contend that the district court erred both in applying the informer's privilege to deny discovery into Doe's identity and track-record and in failing to find a waiver of that privilege. We review the district court's balancing of the "competing interests" bearing on whether to apply the informer's privilege for abuse of discretion. *United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012). Although we have not yet had occasion to define the standard of review for waiver of the informer's privilege, we see no reason not to apply abuse of discretion here, too.

The Supreme Court defined the contours of the informer's privilege in *Roviaro v. United States*, 353 U.S. 53 (1957). *Roviaro* suggests that the privilege is more likely to give way in a criminal proceeding than in a civil one. *Id.* at 60. *Roviaro* otherwise dictates a broad inquiry into the "particular circumstances of each case." *Id.* at 62. We have emphasized two additional considerations. First, we have distinguished between a "mere tipster—someone whose only role was to provide the police with the information that served as the foundation for obtaining a search warrant"—and "a transactional witness who participated in the crime charged against the defendant or witnessed the event in question." *United States v. Harris*, 531 F.3d 507, 515 (7th Cir. 2008) (cleaned up). The further an informant is from a transactional witness, the less need to disclose her identity. *Id.* Second, while the informant's safety is a core rationale for the privilege, the government "need not make a threshold showing of likely reprisal or retaliation against the informant in order to assert the privilege." *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994).

The Wades' lawsuit is civil, and so under *Roviaro* they have less claim to discovery into Doe's identity than they would if they were facing criminal prosecution. Doe falls in the "middle ground status somewhere between participants and mere tipsters." *Id.* at 359. He purchased some of the drugs Johnson was selling. But he was not, for instance, Johnson's lieutenant. Most importantly, Doe has a legitimate safety concern. Evidence in the record indicates that he has given the CPD information about criminal activity hundreds of times, and his tips have resulted in dozens of arrests. Moreover, he is a heroin user who interacts regularly with the same drug dealers about whom he provides tips. In light

of these and the other circumstances, the district court did not abuse its discretion by denying the Wades discovery into Doe's identity and past record as an informant. That said, we emphasize the deferential nature of our review. Our decision today should not be taken as a blanket prohibition against discovery of an informant's identity, no matter the circumstances.

As for waiver, the Wades contend that Doe should be stripped of the informer's privilege because a single filing inadvertently revealed his "IR number." (A savvy user of the relevant databases could use that number to uncover Doe's real name.) This contention fails. The initial production of the IR number was inadvertent, and the disclosure did nothing to nullify Doe's reasonable safety concerns. Moreover, the Wades have not identified evidence establishing wide availability and active use of the IR number. It was thus not an abuse of discretion for the district court to hold that the officers' failure to redact a single number, without more, did not waive an otherwise-valid assertion of privilege.

## III

As we have said many times, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). This case provides a textbook illustration of what we mean by that maxim. Either of the Wades' Fourth Amendment claims, if backed up by a measure of plausible evidence, might well merit a trial. But as we now explain, there is not enough support for either one to permit a factfinder to rule in their favor.

A

We begin with the challenge to the probable cause underpinning the warrant. The Wades contend that Officer Ramos knowingly or recklessly omitted material information about Doe's reliability. If they are correct, Ramos violated the Wades' Fourth Amendment rights. "An officer … violates the Fourth Amendment if he intentionally or recklessly withholds material information from a probable cause affidavit." *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). Normally, we give "great deference" to the warrant-issuing judge's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). But the Wades' material-omission claim cannot be resolved solely on that basis, because "[a]n affidavit that misleads by lies or omission undercuts the magistrate's ability to make an independent probable cause determination." *Rainsberger*, 913 F.3d at 651. We consider first whether there was an omission and then, if so, whether it was material.

In the district court, the Wades alleged that Ramos omitted six relevant facts about Doe. In particular, they contended that Doe had committed several crimes of dishonesty while a registered informant and asserted that his past tips had often proven unreliable. In a thorough discussion, the district court concluded that each of the six purported omissions was without support in the record, was immaterial, or both. We agree with that assessment. And in any case, the Wades do not spill much ink disputing the district court's analysis of any particular omission. The main thrust of their argument on appeal is instead that they were not given a fair chance to substantiate the omissions because they were denied discovery into Doe's identity and record. As we already

have explained, the district court acted within its discretion in refusing to permit that discovery.

The Wades do, however, continue to press one argument: that Ramos did not tell the warrant-issuing judge that Doe was a registered informant *at all*. The officers do not dispute that such an omission occurred. We therefore turn to materiality, using a "straightforward method" to determine whether there is a potential Fourth Amendment violation: we incorporate the allegedly omitted facts and then evaluate "whether the resulting 'hypothetical' affidavit would establish probable cause." *Id.* at 647 (quoting *Bekter v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012)).

Under this methodology, the Wades' argument comes up short for two reasons. First, the other grounds for probable cause—the other portions of the "hypothetical affidavit"—were robust. "In evaluating a probable cause determination based on a confidential witness's report, we look at all the circumstances, including '[1] the level of detail, [2] the extent of firsthand observation, [3] the degree of corroboration, [4] the time between the events reported and the warrant application, and [5] whether the informant appeared or testified before the magistrate.'" *United States v. Thomas*, 835 F.3d 730, 735 (7th Cir. 2016) (quoting *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014)).

Doe's report gets about a 4½ out of 5 on this rubric. Doe appeared before the issuing judge less than 48 hours after making the alleged heroin purchase. The judge asked Doe several specific questions, corroborating Doe's knowledge of the premises. And, drawing on Doe's firsthand observation, the search-warrant application described the premises to be searched and things to be seized with a high level of detail—

including not only the address and seller but also the type and quantity of drugs, the apartment's layout and the drugs' specific location, and even the various sorts of packaging. *Cf. United States v. Peck*, 317 F.3d 754, 756–57 (7th Cir. 2003) (reversing a finding of probable cause where an informant "failed to give specific details about the drugs in Peck's house such as where the drugs were hidden, the total amount of drugs Peck possessed, or the frequency with which Peck sold drugs.") The one weak point was corroboration. Ramos could and should have done more to confirm which unit Johnson occupied. Address verification would have spared the Wades from a violent intrusion by the police and it would have saved the burden and expense of litigation for the City. Nonetheless, "the totality-of-the-circumstances approach means a deficiency in one [respect] may be compensated for by some other indicia of reliability." *Glover*, 755 F.3d at 816 (cleaned up). Here, the other circumstances compensate for the lack of corroboration.

The second problem with the Wades' argument has to do with the purported omission itself. Telling a judge that a John Doe is a registered informant, not an unknown tipster, will usually increase, not decrease, reliability. Compare *United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011) (emphasizing "the fact that the informant's previous dealings with the police led to three arrests in the past six months"), with *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002) (criticizing heavy reliance on "a previously unknown informant"). The best the Wades can say is that *Searcy* and *Koerth* make Ramos's omission of Doe's status suspicious. But that, without more, is not enough to overwhelm the probable cause otherwise established during Doe's appearance before the judge.

B

We turn finally to the search itself. The Wades contend that it was conducted unreasonably in two related senses. First, the officers knew or should have known "immediately" that they had the wrong apartment. Second, even if the initial confusion was understandable, they should have realized the mistake and abandoned the search of the Wades' apartment long before they actually did.

We can quickly dismiss the first theory. The officers had a valid warrant on which they were entitled to rely. That warrant identified the second-floor apartment as the one to be searched. And the discovery of a short stairway leading up to the building's first floor was not enough to alert them to the fact that there was some ambiguity in the identification of floors. When the officers reached the entry stairway, they had no reason to think that Doe had not recognized it for what it was. This is not a case like *Jones v. Wilhelm*, 425 F.3d 455, 463 (7th Cir. 2005), where the officers knew from prior surveillance that the warrant as phrased was "ambiguous and invalid on its face." Nor does this case resemble *Guzman v. City of Chicago*, 565 F.3d 393, 395 (7th Cir. 2009), where officers had a warrant for a "single-family house" but arrived at the address only to find a real-estate office and two separate apartments. Given the facially valid warrant and the lack of immediately self-evident ambiguity, the officers were entitled to enter the Wades' apartment to initiate a search.

The second aspect of the Wades' failure-to-abandon argument finds a bit more purchase. The officers had an obligation to cease the search if and when they realized the mistake. "Law enforcement officers who discover that a search

warrant does not clearly specify the premises to be searched must ordinarily stop and clear up the ambiguity before they conduct or continue the search." *Muhammad v. Pearson*, 900 F.3d 898, 901 (7th Cir. 2018). And the ambiguity here might have been apparent to a conscientious officer after just a few minutes in the building. By that time, the officers were familiar with the building's layout and multiple staircases, had discovered drugs in the downstairs unit, and knew from Johnson's girlfriend that the downstairs unit—not the Wades'—was Johnson's place of operations. On top of that, the officers' quick entry to the downstairs unit and the accompanying "booms" remain unexplained. The officers' account—that they were chasing Johnson—is both contradicted by Dotson and implausible. The officers have never explained how Johnson managed to vanish from the ground floor of a small residential building that was surrounded by officers who had all seen his picture and were there to arrest him.

But the Wades have not carried their evidentiary burden: the gaps in the record preclude sending this theory to a jury. Failure-to-abandon theories of liability such as that evaluated in *Muhammad* turn on each individual officer's actual knowledge of the indicia of a mistake. Yet our record contains no information about when that knowledge accrued for specific defendants. We do not know when the upstairs police learned that drugs had been found downstairs. We do not know how far the upstairs search had progressed when the Wades came home, or when Ramos or the other commanding officers were told that they had come home. We do not know when the Wades informed the upstairs police that they, not Johnson, lived in the second-floor unit. We do not know how long it took to arrest Dotson. We do not know

how long the upstairs search continued after Dotson was removed. We do not even know when the police wrapped up completely and left the building. The meager record the Wades have constructed is silent on each of these critical issues. And without such information, no reasonable jury could find that a specific officer realized a mistake had been made but nonetheless continued the search. Thus, the district court was correct to grant the officers summary judgment.

## IV

The judgment of the district court is AFFIRMED.