In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2138

SHANNON MCCOMAS,

*Plaintiff-Appellee,*

*v.*

EDWARD BRICKLEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-01540-SEB-MJD—**Sarah Evans Barker,** *Judge.*

ARGUED OCTOBER 17, 2011—DECIDED MARCH 13, 2012

Before BAUER, POSNER and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*. The plaintiff-appellee, Shannon McComas, was arrested by the defendant-appellant, Edward Brickley, for murder and for assisting a criminal in the state of Indiana. State prosecutors formally charged McComas only with assisting a criminal and false informing. These charges were later dropped. McComas then brought suit in federal court against Brickley for false arrest under 42 U.S.C. § 1983. Brickley

moved for summary judgment in the district court, arguing that he had probable cause for the arrest and that he is protected by qualified immunity. The court denied his motion. Finding error in the court's qualified immunity determination, we reverse.

## I. BACKGROUND

The events underlying this § 1983 suit for false arrest took place during a 2007 New Year's Eve celebration at Durty Nelly's Pub & Eatery, an Indianapolis bar. McComas was, at the time, an Indianapolis police officer, and his wife was the manager of the bar. McComas was off-duty on New Year's Eve and attended the party at Durty Nelly's. The night progressed without major incident until, at around 3:00 a.m. on New Year's Day, a fight broke out. Surveillance cameras located throughout the bar captured a chaotic series of events that culminated in a shooting just outside of Durty Nelly's front entrance. Several patrons were wounded and a security guard, Ronnie Croom, was killed.

The defendant-appellant, Detective Edward Brickley of the Indianapolis police force, responded to a call for help. He investigated the scene of the shooting and questioned several witnesses, although he did not interview McComas at that time. In the days that followed, Brickley discovered a handgun stashed in a pillowcase on Durty Nelly's premises, and he gained full access to the bar's surveillance videos.

Interviews with various witnesses pointed to Sununguro Runsununkuko (nicknamed "Go-Go") as the primary

culprit in Croom's murder.[1] Go-Go was a member of the security team hired by the bar for the party that night. Brickley examined the surveillance videos, which showed Go-Go using a taser on patrons during the initial outbreak of the fight. Minutes later, McComas is captured on the cameras walking alone to the back of the bar, through the kitchen and toward the bar's office. When he reappears, he is carrying an object in his hand. Moments later, near the bar's front entrance, Go-Go can be seen tasing another group of people. Go-Go eventually walks outside, where he remains during the period of time that the shots were fired. When Go-Go returns to the bar, he hands off an object to another person, Ramirez Hayes, who also worked security that night. Minutes later, Hayes makes his way through the kitchen and to the office in the back of the bar. When interviewed by Brickley, Ramirez stated that the object he received from Go-Go was a .40 caliber Smith & Wesson, the same type of gun Brickley recovered from the scene. After the shots were fired outside and during the ensuing chaos, McComas was stationed near the front door, discharging a taser on at least two occasions in an apparent attempt at crowd control.

In the course of his investigation, Brickley spoke twice to Norman Broaden, the promoter of Durty Nelly's New Year's Eve party. Broaden claimed to have spoken with McComas after police arrived at the scene and intimated that McComas also spoke with Go-Go at

---

[1] Prosecutors would later drop murder charges against Go-Go.

some point after the shooting. It was only after interviewing several witnesses (including Hayes and Broaden), recovering the gun, and studying the surveillance footage that Brickley met with McComas to take his statement. This statement proved critical to McComas's subsequent arrest. McComas initially made several denials. First, he denied being aware of any altercation in the bar that night until he noticed an injured man lying on the floor near the bar's front door. He also claimed that at approximately 3:00 or 3:15 a.m., he accompanied a patron to the back of the bar to retrieve her coat from the bar's office. Next, he explicitly denied speaking to anyone directly about the incident during the aftermath, including Go-Go. He admitted to carrying a taser at times, but claimed that he did not use it that night and reiterated that he "was in the back" and so did not see any fighting. Finally, he denied having any access to a gun that night.

Brickley had gathered enough information to have formed a relatively well-developed theory of what happened that night, and felt that McComas's story did not add up. So he challenged McComas's version of events: "I want you to understand that I've seen the video, the entire video, the whole evening. . . . You're pretty easy to pick out of that thing . . . what you have on is very identifiable in that surveillance video." McComas changed his tack almost immediately. For the first time in the interview, he mentioned that he was drinking that night. He then claimed to have a fuzzy memory about whether he actually saw an altercation and whether he used a taser. Brickley insisted that footage

on the surveillance video shortly after 3:00 a.m. shows McComas walking away from the bar's back office with a gun in his hand. McComas replied, "No, I am not carrying a handgun. I'm carrying my taser." When continually pressed by Brickley, he admitted that he might have used Go-Go's taser at some point in the night, although he continued to adamantly deny having access to a gun.

Shortly after the interview, McComas was arrested for murder and for assisting a criminal. Prosecutors pursued charges of assisting a criminal and false informing, but later dropped even those charges, and McComas filed an action for false arrest against Brickley under 42 U.S.C. § 1983.

## II.  DISCUSSION

The district court denied Brickley's motion for summary judgment, finding that a genuine factual dispute existed as to whether Brickley's actions were protected by the existence of probable cause. The district court denied a motion for qualified immunity by Brickley. Brickley appeals the denial of qualified immunity.

### A.  Appellate Jurisdiction

At the outset, we address a jurisdictional issue. Although typically we cannot review denials of summary judgment, the Supreme Court has carved out an

exception for pre-trial determinations on the issue of qualified immunity, allowing courts of appeals to review them as final judgments under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985); *Sallenger v. Oakes*, 473 F.3d 731, 738 (7th Cir. 2007). Our jurisdiction over these matters is limited, however, to review of issues of law. *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Sallenger*, 473 F.3d at 738.

The district court relied on our decisions in *Chelios v. Heavener* and *Clash v. Beatty* when it held that factual disputes prevented the application of qualified immunity at the summary-judgment stage. *Chelios*, 520 F.3d 678 (7th Cir. 2008); *Clash*, 77 F.3d 1045 (7th Cir. 1996). *Clash* and *Chelios* both involved factually intensive questions of whether officers employed excessive force. This case is different. There are admittedly many factual disputes between the parties, but none are relevant to whether or not qualified immunity applies. In resolving the issue, we take as given any facts that the district court may have assumed when it denied summary judgment. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005) (citations omitted).

## B.  Relevant Standards

Determining whether qualified immunity applies to the actions of a public official involves a two-part inquiry: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional right

at issue was clearly established at the time of the alleged violation. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). We may address these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236-42 (2009). Here, we need only answer the second question to determine that Brickley is entitled to qualified immunity.

To determine if a right was clearly established at the time of an alleged violation, we look at "whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). In the context of a wrongful arrest, the question turns on whether the arresting officer had "arguable probable cause." *Jones*, 630 F.3d at 684. Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest. *Id*.

We review *de novo* the denial of a motion for summary judgment on qualified immunity grounds, keeping in mind that we must adopt the facts as the district court construed them. *Carvajal*, 542 F.3d at 566.

McComas was arrested on suspicion of committing two crimes: murder and assisting a criminal. Murder is defined by Indiana law, in relevant part, as follows: "A person who knowingly or intentionally kills another human being . . . commits murder, a felony." IND. CODE § 35-42-1-1 (2012). It is unclear how prosecutors initially believed they had grounds on which to charge McComas with murder, even under a theory of accomplice liability. Even if McComas had provided a gun

to Go-Go, and Go-Go had used that gun later to shoot at patrons outside, it is an enormous stretch to infer that McComas provided the gun intending to aid Go-Go in killing Croom. There is simply not enough evidence in the record to support even arguable probable cause for an arrest on this charge.

But the absence of arguable probable cause for murder does not preclude judgment in favor of Brickley. The existence of arguable probable cause for either charge is enough to bar liability for false arrest under § 1983. *See Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 762 (7th Cir. 2006).

So we turn to the other charge at the time of McComas's arrest; the charge of assisting a criminal. It is defined under Indiana law in relevant part as follows: "A person who . . . with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists the person commits assisting a criminal." IND. CODE § 35-44-3-2 (2012). The district court believed that it would be forced to make impermissible credibility determinations in order to decide whether arguable probable cause had existed for this charge. Therefore, it concluded, the case must be resolved through a trial. Even under the district court's interpretation of the facts, we disagree.

The district court focused on the fact that the object in McComas's hand as he is leaving the bar's office and walking through the kitchen is unidentifiable. Accepting this, it still does not render unreasonable a conclusion that McComas was assisting a criminal. This is

especially true given the suspicious quality of McComas's statement immediately prior to his arrest. At best, McComas gave an unclear and hazy account of what happened that night. At worst, he lied. He initially claimed not to have seen any altercation and that he became aware of a shooting only when a body was dragged into the bar. He further claimed that he did not use a taser that night. He also told a story about helping a woman to the back office to retrieve her coat. None of these things jibed with what was clear in the surveillance footage, which showed that McComas was directly involved in at least part of an altercation inside the bar and that he used a taser on a group of patrons. It further shows that at around 3:00 a.m., he was walking out of the back office not with a coat, but with a smaller, unidentifiable object in his hand.

Only when Brickley revealed to McComas that the surviellance video contradicted his story did McComas change that story. Under these circumstances, it was certainly not unreasonable for Brickley to conclude he had been lied to. Lying to the police is a bad idea, in part because it creates the impression that the liar has something to hide. This applied especially to McComas, who as a former police officer can reasonably be expected to know the consequences of lying to the police in the course of a murder investigation. Indeed, Brickley's suspicion of McComas's evasiveness is revealed in exchanges like this one:

> McComas: "I'm not afraid of the police. I am the police."

> Brickley:   "I understand that. That's why I'm having such a problem."

In this case, McComas's shifting narrative raised the possibility that he was somehow covering for the supposed shooter, Go-Go. The undisputed facts show that both McComas and Go-Go had been involved in the altercation after the fighting broke out, and at some point in the night, a taser found its way into McComas's hands. Furthermore, Broaden informed Brickley that he saw Go-Go and McComas talking after the shooting occurred, despite McComas's protestations that he had no conversation with Go-Go that night. It is not important whether such a conversation actually happened; it is enough to note that Brickley had reason to believe it did, and reason to distrust McComas's account of events.

We stress that the reasonableness of the arrest does not turn on the plausibility of Brickley's theory about the gun. Indiana law is clear that the crime of assisting a criminal is "obviously intended to cover the situation where a person did not actively participate in the crime itself, but after the commission of the crime aided the criminal." *Smith v. State*, 429 N.E.2d 956, 959 (Ind. 1982), *overruled in part by Wright v. State*, 690 N.E.2d 1098, 1109 (Ind. 1997).

So the important question is whether there was arguable probable cause for the arrest in light of McComas's troubled interview and the way it contradicted the surveillance footage. Considering the totality of the undisputed facts, we find that arresting

McComas was reasonable. *See Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) ("Qualified immunity protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual."). Because there was arguable probable cause on these facts, Brickley is protected by qualified immunity from an action for false arrest.

### C. False Informing

McComas was also charged with false informing, but the charge wasn't brought by prosecutors until some time after his initial arrest. The charge is relevant to McComas's false arrest claim, however, because "an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that some criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Jackson v. Parker*, 627 F.3d 634, 638-39 (7th Cir. 2010) (quoting *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010)). Thus, if there was arguable probable cause for an arrest for false informing, Brickley would be entitled to qualified immunity on this ground also.

We need not dwell on this analysis since the facts underlying the charge of false informing are so closely related to the facts discussed above. Indiana defines the crime as giving "a false report of the commission of a crime or . . . false information in the official investigation of the commission of a crime, knowing the report or information to be false." IND. CODE § 35-44-2-2(d). As we have already noted, the narrative that McComas

initially supplied of his involvement in the events that night at Durty Nelly's was plainly contradicted by the footage on the surveillance videos. When Brickley challenged the narrative on the basis of those videos, only then did the story change. In short, there was arguable probable cause for an arrest immediately following McComas's interview for the charge of false informing.

## III.  CONCLUSION

For the reasons discussed above, we REVERSE the district court's denial of summary judgment on the issue of qualified immunity and REMAND with instructions consistent with this opinion.