In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3009

RICHARD BETKER,

*Plaintiff-Appellee,*

*v.*

RODOLFO GOMEZ, Police Officer,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-cv-00760-LA—**Lynn Adelman**, *Judge.*

ARGUED JUNE 8, 2012—DECIDED SEPTEMBER 5, 2012

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Richard Betker was shot twice during a late-night police raid on his home. The officer who shot him was part of a tactical unit executing a no-knock search warrant secured by Officer Rodolfo Gomez. Officer Gomez obtained the warrant after receiving information from Debbie Capol, the estranged sister of Richard's wife, Sharon, regarding Sharon being a convicted felon allegedly in possession of a firearm.

Capol now swears that most of the information that Officer Gomez related in his affidavit to support the warrant's issuance was not true.

Richard sued Officer Gomez under section 1983 for violating his Fourth Amendment right to be free from unreasonable searches and seizures. Richard claims that Officer Gomez made a series of false or misleading statements in the affidavit that he submitted to obtain the no-knock search warrant and that without those statements probable cause would not have existed. At the close of discovery, Officer Gomez moved the district court for qualified immunity. The district court denied the motion and Officer Gomez now appeals. We conclude that qualified immunity is not appropriate in this case because Betker has produced sworn deposition testimony of Sharon's estranged sister contradicting Officer Gomez's probable cause affidavit. If believed, that deposition testimony would establish that Officer Gomez knowingly or with reckless disregard for the truth made false or misleading statements in the affidavit. Absent Officer Gomez's false statements, probable cause for the no-knock warrant would not have existed. Therefore, we affirm the district court's denial of Gomez's request for qualified immunity.

## I.  BACKGROUND

At 10:00 p.m. on August 4, 2006, roughly fifteen officers from the Milwaukee Police Department's Tactical Enforcement Unit (TEU) executed a no-knock search warrant on the home of Richard and Sharon Betker on a

tip from Sharon's estranged sister indicating that Sharon was a felon in possession of a firearm. Upon arrival, officers smashed the home's front window as a "distraction." They activated their red and blue police lights and beamed a powerful, blinding spotlight through the broken window and into the home. Sharon and Richard Betker, comfortably asleep in bed, were suddenly awakened by the violent crash of shattered glass and became disoriented by the loud, screaming voices and the bright, flashing lights. Unable to comprehend the commands being shouted by TEU officers, Richard instinctively thought that his home had been invaded. He grabbed one of his firearms, crouched behind a wall next to the couple's bedroom doorway, and shouted, "Who are you? What do you want? Who are you, who the f__ are you!" Receiving no response, and feeling that his and his wife's safety were at risk, Richard extended his arm into the doorway and brandished his weapon to show the apparent intruders that he was armed and ready to defend his domain.

Seeing Richard's outstretched arm holding a weapon, TEU Officer Allen Groszczyk immediately fired. His first shot penetrated the door and bedroom wall, hitting Richard in his hand. Groszczyk's other shots traveled the same path and struck Richard's shoulder. With Richard down, officers swarmed the room and detained both him and his wife. Although Officer Groszczyk claims to have yelled "search warrant—police!" before firing, Richard denies hearing or comprehending any verbal notifications or instructions.

With Richard and Sharon securely in custody, the TEU officers began a search of the residence. Officer Rodolfo Gomez was one of the officers who searched the home. He discovered and seized live ammunition and a number of weapons, including five rifles, four shotguns, and a revolver. Other TEU officers found another handgun located between the headboard and mattress of the couple's bed and one more by Richard's bedside table. Richard was arrested for recklessly endangering the safety of others in violation of Wisconsin Statute § 941.30. However, he was never charged. And all of the weapons seized that night have since been returned.

A few days earlier, on July 27, 2006, Debbie Capol called the MPD's "Gun Hotline" to report that her estranged sister, Sharon Betker, was a felon in possession of a firearm. MPD established the hotline as part of a concerted campaign to reduce the number of illegal firearms in Milwaukee. Citizens' calls were usually answered by MPD officers. When Capol called, she spoke to Officer Rodolfo Gomez. Capol identified herself, provided her home address, telephone number, and date of birth, and then asked whether it was illegal for a felon to possess a firearm. Officer Gomez affirmatively responded. Capol then described her sister's alleged crime.

The parties dispute the content of Capol's initial statement to Gomez, as well as what she said to him during their subsequent conversations. Since this case was appealed from a denial of qualified immunity, we construe the facts and evidence in the light most favorable to the plaintiff, *Jewett v. Anders*, 521 F.3d 818,

822-23 (7th Cir. 2008), and we do that in the narrative that follows.

When Capol first spoke to Officer Gomez on July 27, 2006, she told him that Sharon was a convicted felon and that Sharon and her husband, Richard, possessed numerous firearms in their Franklin, Wisconsin home. However, she made clear that she had not personally seen the firearms in question because she had last visited Sharon's home five years earlier, in 2001. Capol also told Gomez that in light of her rocky relationship with her sister she "was concerned about appearing to want to 'burn' Sharon, or have Sharon arrested." Even so, she expressed fear for her own safety because, moments earlier, her son, Zachariah Hamburg, had informed her that Sharon said she would shoot Capol if Capol ever "drove down 76th Street," where Sharon lived. Zachariah relayed the threat to his mother after he and Sharon had an argument. Capol immediately called the gun hotline.

After speaking with Capol, Officer Gomez conducted a preliminary investigation. This consisted of a "property check" to confirm Sharon and Richard's ownership of the home on 76th Street, a brief "drive by" the home, four days later, to take photos and "verify the address and location of the residence," and a routine background check to determine if Sharon had, in fact, been convicted of a felony. Officer Gomez's preliminary investigation revealed that Sharon was convicted of credit card fraud in 1982, a felony at that time, and she lived with her husband Richard at the house on 76th Street. Officer

Gomez never spoke to Zachariah to corroborate Capol's account of Sharon's alleged threat. He did not speak directly with Sharon or Richard. And he did not attempt, in any way, to independently verify that Sharon and Richard kept firearms in their home.

But Gomez did contact Capol again, on August 3, 2006. Capol reiterated that she had not been to Sharon's home since 2001, but said that when she was last there she saw a gun in Sharon's bedroom, gun holsters on each side of the bed, and a gun in a cabinet that Sharon said was there "in case anybody was to mess around with the garage, the cars, or . . . [the] barn." Richard, according to Capol, possessed hunting rifles and stuffed game, hunted illegally, and was once arrested for killing a coyote. Capol reported that Richard and Sharon maintained a home "full of guns." She reached this conclusion based on her pre-2001 visits and information she received from her boyfriend, Dennis Hamburg—who had been told by another friend, William Acker, that the Betkers recently had a "rummage sale" during which they did not sell any firearms (the implication being that the Betkers had guns in the past and did not sell any, so they must still have them). Neither Capol nor Dennis attended the rummage sale. And Officer Gomez did not attempt to contact Acker to obtain more information about what he did or did not see while at the Betker's home.

Following this conversation, Officer Gomez ran a routine background check on Richard, confirming that Richard had once been arrested for illegally shooting

and killing a coyote (a Milwaukee ordinance violation). The next day, August 4, 2006, Officer Gomez drafted a form affidavit to present to the County Court Commissioner to obtain a no-knock search warrant for the Betker home. Accepting the advice of the Assistant District Attorney, Officer Gomez contacted the Wisconsin Department of Natural Resources ("DNR") to determine if Richard had obtained the proper hunting permits. The DNR check revealed that Richard had obtained hunting licenses in four out of the five previous years. Officer Gomez incorporated this information into his affidavit and presented it to the ADA, who signed it without delay.

The relevant parts of the affidavit that Officer Gomez submitted to the Commissioner stated:

> 4) The affiant knows through personal involvement in this investigation and through reports and documents . . . that a convicted felon named Sharon Marie Betker (Capol), white female . . . is reported to be in possession of at least 1 handgun, a dark colored semi-automatic handgun, at her residence. . . . A known citizen witness, who wishes to remain anonymous, stated that within the last 5 days, the informant has observed BETKER in possession or control of at least one handgun, at the above-described address. In addition, the informant stated that Betker and her husband RICHARD BETKER *(w/m . . . )* possess numerous hunting rifles and that they both engage in illegal hunting and the informant has

seen stuffed animals like eagles, which are a protected species, in the residence. Affiant checked with the Wisconsin Department of Natural Resources and confirmed that Richard Betker at the above address obtained a Resident Gun Deer License in 2001 and a Small Game License in 2003, thus corroborating the information related to firearms at the residence.

The witness gave a detailed description of the address that affiant later corroborated in person. In addition, affiant went to the location and observed a female matching the informant's description of BETKER at the residence. (The informant describes BETKER as a white female 5'6"-5'7", 250lbs).

The confidential informant states that he/she is familiar with weapons and the affiant confirmed through interrogation of the informant that the informant had a sound understanding of firearms, and knows the difference between semi-automatic weapons, revolvers, rifles, shotguns, and non-firearm weapons such as compressed air guns. Affiant knows through an NCIC check . . . that BETKER is a convicted felon from Case #1982CF004956, Theft by Fraud.

5) The affiant believes that the informant is a credible person because the informant has given law enforcement officers information, which has been directly corroborated by the knowledge and past experience of law enforcement officers.

The informant is a citizen witness with prior criminal convictions but is not currently under indictment in Milwaukee County for any criminal charges.

6) Affiant knows that firearms are not readily consumed and that they remain in close proximity to individuals engaged in ongoing criminal enterprises.

***

9) That it is common for more than one firearm to be located in a residence and that the information presented in this affidavit forms the basis to request a NO-KNOCK warrant. Specifically affiant states that the possession of firearms on person(s) involved in criminal activity, or having immediate access to them, possesses a severe and real threat to the safety of the officers executing the search warrant.

(Alteration of ¶ 6 in original).

The Commissioner immediately granted Officer Gomez's request for a no-knock warrant. Within a few hours, Officer Gomez contacted Capol once more to be sure that the circumstances she previously described had not changed and that she did not want to make any corrections to her past statements. A few hours later, at 10:00 p.m., the TEU raided the Betkers' home, Richard was severely wounded, and the firearms in his home were seized. Though he was shot multiple times, Richard never fired his weapon.

Richard brought this section 1983 action against several of the officers involved with the raid (including Officer Gomez), the police chief, and the City of Milwaukee. He claimed that the defendants violated his constitutional rights by obtaining and executing the no-knock search warrant without probable cause. The defendants removed this case to federal court and moved for summary judgment. The court granted summary judgment in favor of all of the defendants except Gomez. The court found a genuine issue of material fact regarding whether Gomez intentionally or with reckless disregard for the truth made false or misleading representations in the affidavit he submitted to obtain the no-knock warrant. Officer Gomez appeals the denial of his request for qualified immunity.

## II. ANALYSIS

The only issue presented on appeal is whether Officer Gomez is entitled to qualified immunity. We have jurisdiction to consider this interlocutory appeal of the district court's denial of Gomez's request for qualified immunity because it raises a "purely legal question." *See Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). Our review is *de novo*. *Id.*

Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2011). There is a

two-part test for qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012). But we may address these questions in any order. *Id.*

"A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). We have said that a "reckless disregard for the truth" can be shown by demonstrating that the officer "entertained serious doubts as to the truth" of the statements, had "obvious reasons to doubt" their accuracy," or failed to disclose facts that he or she "knew would negate probable cause." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause. *See Malley v. Briggs*, 475 U.S. 335, 344 (1986). But qualified immunity does not extend where an officer knowingly or recklessly made false statements and "no accurate information sufficient to constitute probable cause attended the false statements." *Lawson v. Veruchi*,

637 F.3d 699, 705 (7th Cir. 2010) (citation omitted). Although the privilege of qualified immunity is a defense, the plaintiff bears the burden of defeating it. *Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

### A. A Reasonable Jury Could Find that Officer Gomez Knowingly or with Reckless Disregard for the Truth Made False or Misleading Statements in His Affidavit.

The dispute in this case centers on whether Officer Gomez "knowingly or with reckless disregard for the truth" made false or misleading statements in the affidavit he submitted in support of his application for the no-knock search warrant. The parties also disagree about whether probable cause would have existed even absent the alleged false and misleading statements. Our task is to decide whether the record contains undisputed evidence demonstrating Officer Gomez's entitlement to qualified immunity as a matter of law. *See Olson v. Tyler*, 771 F.2d 277, 281-82 (7th Cir. 1985). Viewing the facts in the light most favorable to Betker, as we must, we agree that a reasonable jury could find that Officer Gomez knowingly or with reckless disregard for the truth made false statements in his affidavit, without which probable cause for the no-knock warrant would not have existed. Three (of the many) disputed facts are particularly persuasive.

First, in paragraph 4 of his affidavit, Officer Gomez stated that the informant told him that "within the last 5 days" she "observed" Sharon "in possession or control

of at least one handgun" at the Betker's home. Capol's deposition testimony, however, contradicts Gomez's assertion. Capol denied saying that she observed any weapons in Sharon and Richard's home because, as she explained, "the last time [she] was in the house" was in 2001. She testified that she did not personally see Sharon with a gun five days before the warrant was executed, but she "had somebody who did," William Acker. Acker told Dennis Hamburg, who in turn told Capol. But Acker did not say that he had seen guns at the Betker home. He said that he did not see the Betkers selling any firearms at the rummage sale. From this information, transmitted (and possibly transmuted) through Dennis Hamburg, Capol concluded that the Betkers' home was "full of guns." A reasonable jury could find that Officer Gomez knowingly made a false statement by swearing that Capol saw Sharon possess a firearm at her home within the last five days.

Second, Officer Gomez averred, also in paragraph 4 of his affidavit, that Capol informed him that *both* Sharon and Richard "possess numerous hunting rifles and that they both engage in illegal hunting." He also stated that Capol said she was "familiar with weapons" and "knows the difference between semi-automatic weapons, revolvers, rifles, shotguns, and non-firearm weapons such as compressed air guns." These declarations—like Officer Gomez's statement that Capol personally observed Sharon with a gun within the previous five days—are inconsistent with Capol's sworn deposition testimony. Capol's account is that she told Officer Gomez that Richard "is a hunter . . ., has guns . . ., [and]

baited deer on his property," not Sharon. Even Officer Gomez does not deny this, admitting during his deposition that Capol told him that Richard owned hunting rifles and occasionally hunted illegally, and his DNR check revealed that Richard obtained hunting licenses during four of the previous five years. Although Officer Gomez claims that Capol told him that Sharon kept a "dark colored semi-automatic pistol" near her bed, Capol testified during her deposition that she was unsure of "what kind of gun[s]" were in the Betkers' home and recounted that when Officer Gomez had asked her about particular types of guns she was confused because she is "not a gun person." A reasonable jury could find that Officer Gomez knowingly made false statements in his affidavit about that as well.

Third, paragraph 6 of Officer Gomez's affidavit declared that Officer Gomez "knows that firearms are not readily consumed and that they remain in close proximity to individuals engaged in ongoing criminal enterprises." The parties dispute whether the preceding sentence, which apparently was stricken from the affidavit, had any bearing on the Commissioner's probable cause determination. That sentence linked "guns and drugs," and might have been reasonably construed to suggest that Sharon, in addition to illegally possessing firearms, was likely engaged in "drug distribution." Regardless, a reasonable jury might find that by including the unaltered sentence in paragraph 6—which might be technically true—Officer Gomez knowingly or "with reckless disregard for the truth" intimated that Sharon (and Richard) "engaged in ongoing criminal

enterprises," without any reasonable basis for believing that to be the case. This is especially true in light of paragraph 9's intimation that a no-knock warrant was necessary because the person illegally possessing the firearm, Sharon, was a person "involved in criminal activity."

### B.  Probable Cause Would Be Lacking Without Officer Gomez's Material False Statements

A reasonable jury could find that Officer Gomez knowingly or with reckless disregard for the truth made false or misleading statements. So we must decide whether probable cause would have existed for the no-knock search warrant absent those disputed statements. A no-knock warrant requires "reasonable suspicion that knocking and announcing [the police's] presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In Wisconsin, a person commits a crime if he or she is: (1) a convicted felon (2) in possession of a firearm. Wis. Stat § 941.29(2)(a); *see also State v. Black*, 624 N.W.2d 363, 370-71 (Wis. 2001). Possession in the statute "means the defendant knowingly had actual physical control of a firearm." *Black*, 624 N.W.2d at 370-71. Because there is no dispute that Officer Gomez confirmed Sharon's status as a convicted felon, we need only decide whether, absent Officer Gomez's false and misleading statements, a reasonably prudent person would believe that Sharon "possessed" a firearm. We think not.

Our analysis is fairly straightforward. We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting "hypothetical" affidavit would establish probable cause. *See, e.g., United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008) (querying whether the "hypothetical affidavit" would "still establish probable cause"); *see also Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) ("One way of approaching the materiality question is to ask 'whether a hypothetical affidavit that included the omitted material would still establish probable cause.'" (citation omitted)). "In making this determination, we keep in mind that probable cause is a common-sense inquiry requiring only a probability of criminal activity." *Whitlock*, 596 F.3d at 410-11. A search-warrant application will be sufficient to support a probable-cause finding if, "based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003).

Eliminating the disputed statements would strip Officer Gomez's affidavit of details essential to a finding of probable cause. The "hypothetical" affidavit would effectually allege that Sharon is a convicted felon and that an unidentified informant reported that Sharon's husband, Richard, likes to hunt and has been licensed to hunt in the past. Accepting Capol's version of the events, Officer Gomez knew that Capol last saw guns in the Betkers' home five years earlier in 2001. She told him that guns were still in the home, but she drew that

conclusion from Dennis Hamburg's report to her that he received from information from Acker about the Betkers not selling any guns at their recent rummage sale. And Gomez knew about Capol's strained relationship with Sharon, a fact that should have raised a red flag. *See Peck*, 317 F.3d at 757. This was all of the information Officer Gomez had to believe that Sharon illegally possessed a firearm, and none of it was corroborated. Statements that are both unreliable and uncorroborated do not support probable cause. *See United States v. Bell*, 585 F.3d 1045, 1053 (7th Cir. 2009); *United States v. Koerth*, 312 F.3d 862, 871 (7th Cir. 2002).

Officer Gomez's affidavit stated that Capol personally saw Sharon with a gun, but Capol denies telling him that, under oath. This material fact dispute must be resolved at trial. *See Lawson*, 637 F.3d at 705 ("[Judging] the credibility of the competing versions . . . is a question for the jury."). Our conclusion is consistent with our past cases finding no probable cause where the affidavit submitted in support contains materially false or misleading statements. In *Lawson v. Veruchi*, for example, we found probable cause lacking where, like here, the parties disputed the facts that the officer alleged in the affidavit he submitted to obtain a warrant. 637 F.3d at 705. In that case, Kimberly Colvin was assaulted by an unknown man, later identified as Jeffrey W. Lawson ("Jeffrey W"). While investigating Colvin's complaint, Detective Veruchi presented Colvin with a photo lineup that included a picture of Jeffery A. Lawson ("Jeffery A"), which he had obtained by searching "Jeffrey Lawson" in the jail-records system. Veruchi

showed Colvin a number of photos, which included pictures of both Jeffrey W and Jeffery A. Colvin allegedly identified Jeffrey W as the suspect, but Veruchi flipped over the photos and told Colvin to sign the photo of Jeffery A. Veruchi also showed the lineup to another witness, who reported she could not identify the suspect. That witness claimed to have ultimately relented to Veruchi's pressure to identify Jeffrey A, not-withstanding her indication to Veruchi that she was only about 75% sure he was the attacker. In the affidavit he submitted to obtain an arrest warrant for Jeffery A, Veruchi declared that Colvin identified Jeffery A as the person who assaulted her, signed the back of his photograph, and initialed the back of all other photos in the lineup. He also stated that the second witness identified Jeffery A about twenty seconds after she said that she was not sure if she could identify the sus-pect. Finding a material fact dispute over whether Veruchi tricked Colvin and pressured the second witness, we held that the plaintiff presented sufficient evidence to support his claim that Veruchi knowingly included false information in the arrest warrant applica-tion, and Veruchi was not entitled to qualified im-munity as a matter of law. *Id.* at 705.

We reached a similar conclusion about probable cause in *Junkert v. Massey*, 610 F.3d 364, 367 (7th Cir. 2010). There, we found probable cause wanting because "the sum of the [confidential source's] information essentially says that [he], a known thief and cocaine dealer, claimed that he paid off his lawyer, also a cocaine user, with stolen laptop computers at some unspecified

time and place." *Id.* at 368. The confidential source, like Capol here, lacked first-hand knowledge of the places to be searched and the evidence to be discovered. We did however shield the officer in *Junkert* from civil liability because until then we had "never clearly held that an affidavit materially similar to [the officer's] failed to establish probable cause," and "the affidavit was [not] so deficient on its face that [the officer's] reliance on it was unreasonable." *Id.* at 369.

Like in *Lawson* and *Junkert*, probable cause would have been lacking here absent Officer Gomez's disputed declarations. This violated the Fourth Amendment's prohibition on unreasonable searches and seizures. *See Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011) ("The text of the Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.").

### C. The Lack of Probable Cause Was Clearly Established at the Time of the Raid

The final part of our qualified immunity inquiry is whether the constitutional right at stake "was clearly established at the time of the alleged violation." *McComas*, 673 F.3d at 725; *see also Michael C. v. Gresbach*, 526 F.3d 1008, 1013 (7th Cir. 2008) ("If the right was 'clearly established,' the official is not entitled to qualified immunity

from suit."). A brief review of our case law convinces us that it was.

The question is whether, at the time of the violation in this case, a "reasonably well-trained police officer would have known that the arrest was illegal." *Olson*, 771 F.2d at 281. In 1985, we held in *Olson* that immunity does not extend "[w]here the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth." *Id.* In 1992, in *Juriss v. McGowan*, we stripped an officer of qualified immunity where only his false and misleading statements provided probable cause to arrest a woman for aiding a fugitive. 957 F.2d 345, 349-50 (7th Cir. 1992). We reiterated this point in *Knox*, 342 F.3d at 658 ("We have held in previous cases that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue."). And this principle has been firmly established in the criminal context since the Supreme Court decided *Franks v. Delaware*, 438 U.S. 154 (1978). *See also United States v. Whitley*, 249 F.3d 614, 621-22 (7th Cir. 2001). The Court held in *Franks* that a search violates the Fourth Amendment if after setting aside the false or misleading statements in the affidavit submitted to obtain the warrant, the " 'remaining content is insufficient to establish probable cause.' " *See United States v. Spears*, 673 F.3d 598, 604 (7th Cir. 2012) (quoting *Franks*, 438 U.S. at 156). In the civil context, the plaintiff need only "point to

a closely analogous case decided prior to the challenged conduct in order to defeat qualified immunity." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002). We think there are plenty. So Officer Gomez is not entitled to qualified immunity as a matter of law.

### III. CONCLUSION

For the above-stated reasons, the district court's denial of the defendant's request for qualified immunity is AFFIRMED.