# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed: February 8, 2016

No. 12-7127

THEODORE WESBY, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

EDWIN ESPINOSA, OFFICER - METROPOLITAN POLICE
DEPARTMENT, IN BOTH HIS OFFICIAL AND INDIVIDUAL
CAPACITIES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00501)

———

On Petition for Rehearing En Banc

———

Before: GARLAND, *Chief Judge*; HENDERSON,** ROGERS,
TATEL, BROWN,** GRIFFITH,** KAVANAUGH,** SRINIVASAN,
MILLETT, PILLARD, ** AND WILKINS,* *Circuit Judges*

2

# **O R D E R**

Appellants' petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

## **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Ken Meadows
Deputy Clerk

\* Circuit Judge Wilkins did not participate in this matter.

\*\* Circuit Judges Henderson, Brown, Griffith, and Kavanaugh would grant the petition for rehearing en banc.

\*\* A statement by Circuit Judge Pillard and Senior Circuit Judge Edwards, concurring in the denial of rehearing en banc, is attached.  Pursuant to Fed. R. App. P. 35(a), Senior Judge Edwards, a member of the merits panel, did not participate in the vote whether to grant rehearing en banc.

\*\* A statement by Circuit Judge Kavanaugh, with whom Circuit Judges Henderson, Brown, and Griffith join, dissenting from the denial of rehearing en banc, is attached.

PILLARD, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*, concurring in the denial of rehearing *en banc*: The panel opinion has none of the ambition that Judge Kavanaugh, dissenting from denial of rehearing *en banc*, attributes to it. It does not alter the law of probable cause or the law of qualified immunity. The panel agrees with virtually everything the dissent says about the law. Our disagreement is about the facts.

I.

The dissent accuses us of establishing new rules of law. We have done no such thing. In fact, we view the law the same way the dissent does.

1. The dissent asserts that we created a new rule "that officers are required to believe the statements of suspected trespassers who claim that they have permission to be on the property." Dissent 18. It contends that our opinion obliges officers to accept suspects' implausible protestations of innocence and ignore other, circumstantial evidence of culpability. *Id.* at 9-10. That is not the law, nor did we so hold.

Rather, we agree with the dissent that, if the facts of which officers are aware and the reasonable inferences that arise from those facts cast doubt on a suspect's story, officers need not credit the suspect. *See id.* at 12, 18. Indeed, our opinion specifically acknowledges that officers are "entitled to discredit" a suspect's claims of an "innocent explanation for entry into a house in the face of conflicting evidence," *Wesby v. District of Columbia*, 765 F.3d 13, 21 n.4 (D.C. Cir. 2014) (citing *Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005)); if other facts give rise to probable cause, the officer may arrest, "notwithstanding exculpatory statements from the suspect," *id.* (quoting *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002)).

We also acknowledged that circumstantial evidence may "make it reasonable to infer" that a suspect has a culpable state of mind. *Id.* at 22. To reach that conclusion, officers do not need trial-worthy evidence. We expressly noted that "[p]robable cause 'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" *See id.* at 20 (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)). The dissent agrees. *See* Dissent 7 ("To have probable cause to arrest, a police officer does not need proof beyond a reasonable doubt, or even by a preponderance of the evidence, that an individual committed a crime.").

Taking these points together, so long as there is evidence giving rise to probable cause—even if that evidence is only circumstantial and short of preponderant—officers may lawfully arrest, no matter what a suspect claims in his or her own defense. There is nothing novel about our view. The dissent's sampling of cases from across the circuits confirms that it is widely held. *See id.* at 11-14.

2. The dissent worries that our opinion erodes the protection qualified immunity provides officers who must make "on-the-spot credibility judgments" and quickly "resolve difficult mens rea questions." *Id.* at 2, 11. Our first point of agreement should put the dissent at ease—officers are not required to take suspects at their word when they deny their guilt. A second point also ought to assuage the dissent: If officers mistakenly conclude that there is probable cause, they are nonetheless entitled qualified immunity if their mistake was reasonable. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Our opinion does not ignore or weaken that important protection, which gives officers the necessary "breathing room" to perform their difficult, dangerous jobs and safeguard the public. *Ashcroft v. al-Kidd,*

131 S. Ct. 2074, 2085 (2011). It simply finds that a reasonable officer could not conclude, based on the information before *these particular officers*, that there was probable cause.

It is also worth noting that this case is quite unusual, in that the officers did not make any heat-of-the-moment judgment calls about the partygoers' mens rea or whether they were telling the truth about having been invited. First, nothing about the investigation was rushed and nothing about the situation posed any imminent risk. The officers spent two hours on the scene calmly assessing the situation, J.A. 381, and more time back at the station deliberating over which charge to bring. (The officers originally processed the partygoers for unlawful entry, then dropped that charge and, after discussing the case with representatives of the Attorney General's office, processed them for disorderly conduct, then dropped that charge as well. J.A. 45-50.) Second, these defendants did not in fact make any determinations about the partygoers' mindset, because they did not think either one mattered. *See infra* 9 & n.1.

## II.

We and the dissent agree on two other clearly established points of law.

1. The dissent does not dispute our rather unexceptional statement that arresting officers need "at least some evidence that the arrestee's conduct meets each of the necessary elements of the offense that the officers believe supports arrest." *Wesby*, 765 F.3d at 26. When officers lack probable cause to believe that a necessary element of an offense is present, they lack probable cause to arrest. *See id.*; *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999); *accord Wright*, 409 F.3d at 602 ("Whether any particular set

of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue."). The same is true when the only circumstances officers observe amount to conduct that is privileged by a defense.

Setting aside for the moment its particular application here, the dissent seems to agree with that proposition as a legal matter. *See* Dissent 10-11, 15. The dissent quotes with approval a recent Second Circuit statement of the law that officers must accept a suspect's defense if "'the facts establishing that defense were so clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs.'" *Id.* at 15 (quoting *Garcia v. Does*, 779 F.3d 84, 93 (2nd Cir. 2015) (amended opinion)). Our decision fully comports with *Garcia*. Our own prior decisions and those of other courts are in accord. *See Hutchins v. District of Columbia*, 188 F.3d 531, 535 (D.C. Cir. 1999) (en banc) (noting that a police officer may detain a minor for violating a curfew law if the "police officer reasonably believes that an offense has occurred under the curfew law and that no defense exists"); *Tillman v. Wash. Metro. Area Transit Auth.*, 695 A.2d 94, 96 (D.C. 1997) (acknowledging the "unusual" possibility of circumstances that, "while undoubtedly proving an unlawful act, nonetheless demonstrated so clearly that the suspect lacked the required intent that the police would not even have probable cause for an arrest"); *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (observing that the "law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States*, [267 U.S. 132, 162 (1925)], that probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the

time of an arrest," which includes an arrestee's "uncontroverted" defense).

2. In addition to agreeing that officers need "some showing" of each element, *Wesby*, 765 F.3d at 22, we and the dissent agree that the key element in this case was whether the partygoers entered a place they *knew or should have known* was off limits. The dissent does not dispute, nor could it, that it is no crime for a person to enter premises without authorization if that person has a bona fide belief that she is permitted to enter. It frames the issue well:

> It is undisputed that the partiers were on private property without permission from an owner or renter, and without other lawful authority. Therefore, this is a case where the actus reus of the crime was complete. The sole issue from the perspective of a reasonable police officer was whether the partiers had the necessary mens rea to commit the crime of trespassing. If the partiers believed that they had permission from a lawful owner or renter to use the house, then the partiers did not commit the offense of trespassing under D.C. law.

Dissent 9.

At the time of the challenged arrests, the law in the District of Columbia had, indeed, long been clear that in unlawful entry cases the suspect's state of mind matters. *See, e.g., Artisst v. United States*, 554 A.2d 327, 330 (D.C. 1989) (affirming because the evidence showed "appellant's intention to be on the premises contrary to [the owner's] will"); *Culp v. United States*, 486 A.2d 1174, 1177 (D.C. 1985) (affirming because "officers could reasonably conclude that appellant knowingly entered 'against the will of . . . the person lawfully in charge'"). By the same token, it had long been clear that if

6

a person has "a bona fide belief" that he is permitted to enter, "he lacks the element of criminal intent required by" the law "and is not guilty of unlawful entry." *Smith v. United States*, 281 A.2d 438, 439 (D.C. 1971); *see McGloin v. United States*, 232 A.2d 90, 91 (D.C. 1967). Although the *Ortberg* case, which came down after these arrests, stated more precisely the culpable state of mind required to prove unlawful entry, *Ortberg* simply articulated what "decades of case law" had already made "clear"—that the government must "establish that the defendant knew or should have known that his entry was unwanted." *Ortberg v. United States*, 81 A.3d 303, 307 (D.C. 2013). Indeed, the model jury instruction for unlawful entry going back to at least 1993 describes the required state of mind in those terms. *See* Criminal Jury Instructions for the District of Columbia, No. 4.36 (4th ed. 1993) ("The government must prove beyond a reasonable doubt not only that the defendant entered against the will of the lawful occupant of the premises, but also that s/he knew, or should have known, that s/he was entering against the will of the occupant.").

III.

The only criticism we have of the dissent's view of the law is that it would relieve the officers of their burden to justify an arrest by effectively presuming probable cause if nothing in the record forecloses it. The dissent commits that error in sketching three scenarios, two that it describes as supported by probable cause, and one that it acknowledges is not. Dissent 14-15. The first possibility the dissent identifies is that, although Peaches invited them, the partygoers knew or might have known that she was not renting the house and so could not lawfully invite them there. A second possibility is that the partygoers might have lied to the police when they said that Peaches invited them, and that Peaches then made up

a corresponding lie to give her friends cover. In the third scenario, the partygoers told the truth that Peaches invited them, and they had no reason to suspect that she was not authorized to do so. The dissent contends that each scenario is possible, and that "the officers did not have a way to rule out either of the first two scenarios." *Id*. at 15.

We have two responses. First, there is no evidence in the record that suggests that the partygoers and Peaches cooked up a plot to mislead the police, and the dissent points to none. Instead, the dissent simply speculates, "[w]ho knows" whether or how they might have coordinated? *Id.* at 14. Certainly not the officers. They never—neither at the time of the arrest nor during the subsequent litigation—pointed to a circumstance tending to show that the partygoers and Peaches were colluding.

Second, and more fundamentally, in suggesting that a lack of information—a "who knows?" gap—could suffice to support probable cause, the dissent advocates a position that would impermissibly shift the burden of discerning probable cause. Officers may not do what the dissent does—posit that a person is up to no good and then ask whether there is clear reason to rule out any theoretical wrongdoing. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *Adams*, 407 U.S. at 148 ("Probable cause to arrest depends 'upon whether, at the moment the arrest was made . . . the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The probable cause requirement, even as flexible and

contextual as it appropriately is, authorizes arrest only when the facts and circumstances give officers reason to believe that someone is violating or has violated the law.

The bare, unsupported possibility that an officer *might have* disbelieved the partygoers when they said they had been invited is not ground for arrest—nor for qualified immunity. *Contra* Dissent 19. The dissent contends that an officer's doubts about a suspect's credibility count as "information" that can controvert evidence dissipating probable cause. *Id*. at 10, 20. We do not disagree with that proposition as a legal matter. When officers actually doubt a suspect's credibility, and when those doubts fairly arise from their observations and the information available to them, officers may take their doubts into account when assessing whether the totality circumstances support probable case. *See, e.g.*, *McComas v. Brickley*, 673 F.3d 722, 726-27 (7th Cir. 2012); *Wright*, 409 F.3d at 603. The officers in this case, however, did not actually doubt that the partygoers were telling the truth when they said Peaches invited them. In fact, the officers did not think the partygoers' credibility mattered at all. They did not think it mattered because they believed—incorrectly and unreasonably—that the partygoers' state of mind was legally irrelevant.

## IV.

Our disagreement with the dissent comes down to our case-specific assessment of the circumstantial evidence in the record.

We found that an officer could not conclude—not even reasonably, though mistakenly—that the partygoers had a culpable state of mind. It is not surprising that the record, consisting of what the officers took note of at the time, lacks evidence of what the partygoers knew, or even what they

ought to have known, about whether they had been legitimately invited into the house. At the time of the arrest, and even in this litigation, the defendants misunderstood the clearly established elements of unlawful entry. They believed (erroneously) that it did not matter what the partygoers knew or did not know about their permission to be at the premises. Once the owner told the officers he had not yet rented the house to Peaches and he had not allowed the guests to attend a party there, the officers believed they had all they needed.[1]

---

[1] When opposing counsel asked Sergeant Suber at his deposition if it mattered "whether or not [the partygoers] believed, based upon what Peaches told them, that they had the right to be there," he answered, "Peaches nor the other individuals occupying that location did not have the right to be there." J.A. 48; *see id.* at 129 ("Q: And so what I'm trying to understand is why did you reach that conclusion [that it was a lawful arrest] when you knew that Peaches had given them permission to be there? [Suber]: Because Peaches didn't have permission to be there."); *see also id.* at 99 (deposition testimony of Defendant Officer Parker explaining that Sergeant Suber decided to arrest everyone because the owner had said that nobody had his permission to be in the house).

Even in their summary judgment papers, the defendants continued to assert the irrelevance of the partygoers' mindset. The defendants acknowledged that "each of [the partygoers] admitted that they were social guests," but stressed that "this statement is not material" because none of the plaintiffs owned the property and liability turns on "whether MPD Officers reasonably believed that the plaintiffs were not the owners and did not have a possessory interest in the property." J.A. 59 (Defs.' Resp. to Pls.' Statement of Facts, ECF No. 30, Ex. 1 at 2). In their rehearing petition before this court as well, the defendants suggest that it somehow was not clearly established that the offense of unlawful entry includes a state of mind requirement. *See* Pet. Reh'g En Banc 12 (contending that the panel erred because it "found the law clearly established

Of course, even though the defendant officers in this case did not seek to determine whether the partygoers themselves knew or should have known that they were not authorized to be present at the house, if the information known to the officers when they made the arrests nonetheless fairly suggested that the partygoers were or should have been aware that they were unwelcome, the arrests would have been lawful. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Bookhardt*, 277 F.3d 558, 565 (D.C. Cir. 2002); *United States v. Joyner*, 492 F.2d 655, 656 (D.C. Cir. 1974) (per curiam) ("[A]n arrest will be upheld if probable cause exists to support arrest for an offense that is not denominated as the reason for the arrest by the arresting officer."). And if the facts in the record could at least arguably give rise to probable cause, the defendants would be entitled to qualified immunity. *See Hunter*, 502 U.S. at 227; *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993).

The dissent thinks an officer in the defendants' position could reasonably believe there was probable cause. Dissent 14-15. For the reasons explained in our opinion, we disagree that the record here supports probable cause, either actually or arguably. That is the extent of our disagreement, no more, no less. Our dispute—whether these particular defendants are entitled to qualified immunity on the plaintiff's Fourth Amendment claim—is entirely "fact-bound," *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1779 (2015) (Scalia, J., concurring in part and dissenting in part), and therefore hardly deserves the dissent's doomsaying. As our nearly complete agreement with the dissent on the governing

'that probable cause required some evidence that the Plaintiffs knew or should have known that they were entering against the will of the lawful owner'" (quoting *Wesby*, 765 F.3d at 27)). As discussed in the court's opinion and in the text, *supra* 5-6, that is a misstatement of clearly established law.

principles underscores, we did not invent or invert any law to reach the result in this case.  And the thinness of the record is quite anomalous, as it stems from the officers' legal error at the scene.  We accordingly concur in the denial of rehearing *en banc*.

KAVANAUGH, *Circuit Judge*, with whom *Circuit Judges* HENDERSON, BROWN, and GRIFFITH join, dissenting from the denial of rehearing en banc: In a series of recent qualified immunity cases, the Supreme Court has repeatedly told the courts of appeals that police officers may not be held liable for damages unless the officers were "plainly incompetent" or "knowingly violate[d]" clearly established law. *Carroll v. Carman*, 135 S. Ct. 348, 350, slip op. at 4 (2014) (internal quotation marks omitted). The Supreme Court "often corrects lower courts when they wrongly subject individual officers to liability." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 n.3, slip op. at 10 n.3 (2015). Indeed, in just the past five years, the Supreme Court has issued 11 decisions reversing federal courts of appeals in qualified immunity cases, including five strongly worded summary reversals. *See Mullenix v. Luna*, 136 S. Ct. 305 (2015) (summary reversal); *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (summary reversal); *Sheehan*, 135 S. Ct. 1765; *Carroll*, 135 S. Ct. 348 (summary reversal); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Wood v. Moss*, 134 S. Ct. 2056 (2014); *Stanton v. Sims*, 134 S. Ct. 3 (2013) (summary reversal); *Reichle v. Howards*, 132 S. Ct. 2088 (2012); *Ryburn v. Huff*, 132 S. Ct. 987 (2012) (summary reversal); *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011).

In my view, the panel opinion in this case contravenes those emphatic Supreme Court directives. Two D.C. police officers have been held liable for a total of almost $1 million. That equates to about 20 years of after-tax income for the officers, not to mention the harm to their careers.[1] For what?

---

[1] As the Supreme Court has said: "Whatever contractual obligations" the District of Columbia "may (or may not) have to represent and indemnify the officers are not our concern. At a minimum, these officers have a personal interest in the correctness of the judgment below, which holds that they may have violated the Constitution." *Sheehan*, 135 S. Ct. at 1774 n.3, slip op. at 10 n.3.

For arresting for trespassing a group of people who were partying late at night with drugs and strippers *in a vacant house that the partiers did not own or rent*. To be sure, the partiers claimed that they had permission from a woman named Peaches to use the vacant house. But the officers soon learned that Peaches herself did not have permission to use the house. And the officers reasonably could have thought that the partiers probably knew as much. Therefore, the officers reasonably could have concluded that there was probable cause to arrest the partiers for trespassing. The officers were not "plainly incompetent" and did not "knowingly violate" clearly established law when they made these arrests. The officers are entitled to qualified immunity.

The Supreme Court has reminded us that qualified immunity is important "to society as a whole." *Sheehan*, 135 S. Ct. at 1774 n.3, slip op. at 10 n.3 (internal quotation marks omitted). That holds true in this case. The Attorney General for the District of Columbia has filed a vigorous petition for rehearing en banc. The Attorney General's petition convincingly explains how the panel opinion will negatively affect the ability of D.C. police officers to make the on-the-spot credibility judgments that are essential for officers to perform their dangerous jobs and protect the public. I would grant the Attorney General's petition.

Responding to this dissent, the panel majority says that it agrees with this dissent about the law and that our disagreement with one another is simply about how the law applies to the facts. But that is true in most qualified immunity cases. At a high enough level of generality, the law of qualified immunity is settled, as are the relevant Fourth Amendment principles. But what has concerned the Supreme Court in numerous cases is how lower courts apply the general qualified immunity and Fourth Amendment principles

to the facts of particular cases.[2] That is my concern here as well.

I

At about 1:00 a.m. on March 16, 2008, the District of Columbia's Metropolitan Police Department received a complaint about loud music and possible illegal activity at a house east of the Anacostia River between Benning Road and East Capitol Street, a short distance northeast of RFK Stadium. According to the caller, the house where the party was taking place had been "vacant for several months." Metropolitan Police Department Arrest/Prosecution Report, reprinted in Joint Appendix ("J.A.") 73.

Police officers quickly responded to the scene. The officers heard music coming from inside the house. After knocking on the door and entering, the officers observed that the house was sparsely furnished and "in disarray," consistent "with it being a vacant property." *Id.* In the living room, they saw a large group of people engaged in behavior consistent "with activity being conducted in strip clubs for profit." *Id.* Several women were "dressed only in their bra and thong with

---

[2] In similar en banc circumstances, another court of appeals recently reconsidered a panel opinion about qualified immunity in a false arrest case. In *Garcia v. Jane & John Does 1-40*, 779 F.3d 84 (2d Cir. 2015), Judge Calabresi and Judge Lynch, over the dissent of Judge Livingston, originally denied the officers' qualified immunity motion. After the officers filed a strongly worded petition for rehearing en banc, the three-judge panel unanimously issued an amended opinion holding that the police officers were entitled to qualified immunity. *See id.* at 87. Many of the issues in that Second Circuit case resemble the issues in this case. I respectfully suggest that similar re-examination of the original panel opinion would have been warranted here.

money hanging out" of "their garter belts." Officer Khan Interrogatory, J.A. 163. The officers smelled marijuana. When the officers entered, the partiers initially scattered into other rooms.

The officers talked to everyone present in the house. The 21 people who were there told the officers conflicting stories about what they were doing on the property. Some said they were celebrating a birthday party. Most said it was a bachelor party. But the guest of honor was not identified to the officers.

The people in the house also gave conflicting stories about who had supposedly given them permission to use the house. No one could identify the owner of the house. Several people said that they had been invited by other people. Some said that a woman known as "Peaches" or "Tasty" had given the partiers permission to use the house. But Peaches was not present at the house.

Notwithstanding the conflicting stories and suspicious circumstances, the officers did not immediately arrest the partiers for trespassing. Rather, the officers took time to further investigate the situation. The officers contacted both Peaches and the owner of the house. They reached Peaches by phone. The officers thought that Peaches was evasive. Peaches said that she had given the partiers permission to use the house. But when the officers asked who in turn had given Peaches authority to use the house, Peaches responded that she was "possibly renting the house from the owner," who was "fixing the house up for her." *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 25-26 (D.D.C. 2012) (Deposition of Sergeant Suber). When pressed by the officers, Peaches finally admitted that she did not have authority to use the house. She refused to come to the house

because she said that she would be arrested. She hung up the phone on the officers.

The officers then called the owner of the house, Mr. Hughes. Mr. Hughes told the police officers that no one – including Peaches – had authority to use the house.

After they had assessed the scene, talked to the partiers, and gathered information from Peaches and Mr. Hughes, the police officers arrested the people in the house for trespassing, an offense known as "unlawful entry" under D.C. law. Trespassing is a minor offense under D.C. law.[3] Prosecutors later decided not to pursue charges against the partiers.

After all of the charges arising out of the incident had been dropped, many of the 21 people who had been arrested turned around and sued the police officers and the District of Columbia under Section 1983 and D.C. law. The plaintiffs claimed that the officers had made the arrests without probable cause. The officers countered that they had probable cause to arrest the plaintiffs for trespassing. The officers also asserted that, in any event, they were entitled to qualified immunity for two distinct reasons. First, it was at least reasonable for the officers to believe that they had probable cause to arrest under these factual circumstances. And second, the officers did not contravene any clearly established law by making these arrests for trespassing.

On cross motions for summary judgment, the District Court concluded that the officers did not have probable cause to arrest and, moreover, were not entitled to qualified immunity. The District Court granted summary judgment to

---

[3] Under D.C. law, trespassing is punishable by a maximum jail sentence of 180 days and a maximum fine of $1,000. D.C. Code § 22-3302.

the plaintiffs.  After a trial on damages, a jury awarded the plaintiffs $680,000.  Attorney's fees brought the total award to almost $1 million.  The police officers and the District of Columbia are jointly and severally liable for that total.[4]

The District of Columbia and the police officers appealed to this Court.  A panel of this Court affirmed the judgment of the District Court.  The panel opinion concluded that the police officers did not have probable cause to arrest the plaintiffs and were not entitled to qualified immunity.  Judge Brown dissented.  The District of Columbia and the police

---

[4] For purposes of Section 1983 liability, the District of Columbia is considered a municipality.  *See People for the Ethical Treatment of Animals v. Gittens*, 396 F.3d 416, 425 (D.C. Cir. 2005).  As a municipality, the District of Columbia "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Singletary v. District of Columbia*, 766 F.3d 66, 72 (D.C. Cir. 2014) (quoting *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978)) (internal quotation marks omitted).  The District of Columbia may be held liable under Section 1983 only when the execution of a government "policy or custom" inflicts an injury for which the District of Columbia "as an entity is responsible under § 1983."  *Id.* (quoting *Monell*, 436 U.S. at 694) (internal quotation marks omitted).

In this case, the plaintiffs did not allege that a government policy or custom led to the arrests.  Because respondeat superior is not a theory of liability in Section 1983 cases against municipalities, the District of Columbia was therefore not liable for the Section 1983 claims.  The District of Columbia instead was liable for the D.C. law claims.  The damages award was not apportioned between the Section 1983 and D.C. law claims.  The District of Columbia and the two officers are jointly and severally liable for the full amount.

officers sought rehearing en banc. I would grant en banc review.

## II

The police officers persuasively argue that they had probable cause to arrest the partiers for trespassing. But regardless of whether the officers had probable cause, they are entitled to qualified immunity because they at least *reasonably could have believed* that they had probable cause. Could the officers have walked away from the vacant house filled with partiers? Sure. Could they have broken up the party and then left? No doubt. Indeed, in retrospect, that might well have been a better decision. But did the officers act in a "plainly incompetent" manner or "knowingly violate" clearly established law by making these arrests for trespassing? No.

To begin with, the probable cause standard itself gives police officers substantial leeway when determining whether to make an arrest. As the Supreme Court has explained, probable cause is a "fluid concept" that turns on "factual and practical considerations of everyday life on which reasonable and prudent" persons, "not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983) (internal quotation marks omitted). Probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. To have probable cause to arrest, a police officer does not need proof beyond a reasonable doubt, or even by a preponderance of the evidence, that an individual committed a crime. As the Supreme Court has emphasized: "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence" have "no place in the [probable-cause] decision." *Florida v. Harris*, 133 S. Ct. 1050, 1055, slip op.

at 5 (2013) (alteration in original) (internal quotation marks omitted).

In damages suits against officers, the doctrine of qualified immunity adds an extra dose of judicial deference to our review of the officer's probable cause determination. As a general matter, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 135 S. Ct. 348, 350, slip op. at 4 (2014) (internal quotation marks omitted). The "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, slip op. at 13 (2014).

In applying the qualified immunity doctrine to the issue of probable cause to make arrests, the Supreme Court has said that officers "who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted); *see also Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993). In accord with that Supreme Court precedent, most courts of appeals – including our Court – have ruled that officers may not be held liable for damages for allegedly wrongful arrests so long as they had "arguable probable cause" to make the arrest. *See, e.g.*, *Moore v. Hartman*, 644 F.3d 415, 422 (D.C. Cir. 2011), *vacated on other grounds*, 132 S. Ct. 2740 (2012); *Cox v. Hainey*, 391 F.3d 25, 33 (1st Cir. 2004); *Garcia v. Jane & John Does 1-40*, 779 F.3d 84, 92 (2d Cir. 2015); *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 207 (5th Cir. 2009); *Greene v. Barber*, 310 F.3d 889, 898 n.2 (6th Cir. 2002); *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012); *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013); *Blankenhorn v. City of*

*Orange*, 485 F.3d 463, 475 (9th Cir. 2007); *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014); *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1324 (11th Cir. 2014).

Therefore, in suits alleging a lack of probable cause to arrest, officers are not liable if they *arguably* had probable cause – that is, if the officer *reasonably could have believed* that there was probable cause to arrest.

As a result, the qualified immunity question in this case is not whether the officers had probable cause to arrest the partiers at the house. Rather, the question is whether the officers *reasonably could have believed* that they had probable cause to arrest for trespassing a group of people who were having a party late at night with strippers and drugs in a vacant house that none of the partiers owned or rented, notwithstanding the partiers' claims that they had permission from a woman named Peaches to use the house.

The qualified immunity question in this case is readily answered by a few basic principles of criminal law and procedure. Under D.C. law, it is unlawful to enter private property without permission from the owner or renter, or without other lawful authority. *See Ortberg v. United States*, 81 A.3d 303, 306-07 (D.C. 2013). It is undisputed that the partiers were on private property without permission from an owner or renter, and without other lawful authority. Therefore, this is a case where the actus reus of the crime was complete. The sole issue from the perspective of a reasonable police officer was whether the partiers had the necessary mens rea to commit the crime of trespassing. If the partiers believed that they had permission from a lawful owner or renter to use the house, then the partiers did not commit the offense of trespassing under D.C. law. *See id.* at 308-09.

The only question in this case, then, is whether the officers could reasonably disbelieve the partiers when the partiers said that they thought they had permission to use the house.

In a case like this where the actus reas is complete and the sole issue is the defendant's mens rea, police officers often must make credibility assessments on the spot, sometimes in difficult circumstances. In those situations, are police officers always required to believe the statements of the suspects – in this case, the partiers in the house? Of course not. Yet the panel opinion seems to say yes, at least for this kind of case. According to the panel opinion, "in the absence of any conflicting information," a police officer does not have probable cause to arrest people for trespassing if those people claim that they were invited by "someone with apparent (if illusory) authority." *Wesby v. District of Columbia*, 765 F.3d 13, 21 (D.C. Cir. 2014). And under the panel's approach, even if a reasonable police officer could have doubted the credibility of the people claiming to have been invited to the house, those credibility doubts do not count as "conflicting information." *See id.*

The panel opinion's approach is not and has never been the law. When police officers confront a situation in which people appear to be engaged in unlawful activity, the officers often hear a variety of mens rea-related excuses. "The drugs in my locker aren't mine." "I don't know how the loaded gun got under my seat." "I didn't realize the under-aged high school kids in my basement had a keg." "I wasn't looking at child pornography on my computer, I was hacked." "I don't know how the stolen money got in my trunk." "I didn't see the red light." "I punched my girlfriend in self-defense."

But in the heat of the moment, police officers are entitled to make reasonable credibility judgments and to disbelieve protests of innocence from, for example, those holding a smoking gun, or driving a car with a stash of drugs under the seat, or partying late at night with strippers and drugs in a vacant house without the owner or renter present. As Judge Brown said, the law does not require officers "to credit the statement of the intruders regarding their own purportedly innocent mental state where the surrounding facts and circumstances cast doubt on the veracity of such claims." *Wesby*, 765 F.3d at 36 (Brown, J., dissenting). And as the Second Circuit recently stated: A police officer is required to accept a suspect's *mens rea*-related defense only if, among other things, "the facts establishing that defense were so clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs." *Garcia*, 779 F.3d at 93.

Almost every court of appeals has recognized that officers cannot be expected to *definitively* resolve difficult mens rea questions in the few moments in which officers have to decide whether to make an arrest. Consider the following sample:

- "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Amobi v. D.C. Department of Corrections*, 755 F.3d 980, 990 (D.C. Cir. 2014) (internal quotation marks omitted).

- The "practical restraints on police in the field are greater with respect to ascertaining intent and, therefore, the latitude accorded to officers considering

the probable cause issue in the context of mens rea crimes must be correspondingly great." *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004).

- "It is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer. . . . Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

- "Absent a confession, the officer considering the probable cause issue in the context of crime requiring a mens rea on the part of the suspect will always be required to rely on circumstantial evidence regarding the state of his or her mind." *Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000).

- "The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005).

- In "considering the totality of the circumstances," a defendant's "innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus." *Sennett v. United States*, 667 F.3d 531, 536 (4th Cir. 2012) (internal quotation marks omitted).

- An investigator's "failure to make a further investigation into the suspect's state of mind does not constitute lack of probable cause if all objective elements of a crime reasonably appear to have been completed." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 586 (5th Cir. 1999) (internal quotation marks omitted).

- Police are "under no obligation to give any credence to a suspect's story . . . if the facts as initially discovered provide probable cause." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (internal quotation marks omitted).

- "Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established." *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999).

- "When an officer is faced with conflicting information that cannot be immediately resolved," the officer "need not rely on an explanation given by the suspect" and "may have arguable probable cause to arrest a suspect." *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012) (internal quotation marks omitted).

- "Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior. The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (internal quotation marks omitted).

- The police officers "were not required" to forgo arresting the defendant "based on initially discovered facts showing probable cause simply because" the defendant "offered a different explanation." *Marx v. Gumbinner*, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990).

Here, in the brief time in which the officers had to decide whether to make arrests, they could not definitively resolve the difficult question of the partiers' mens rea. Mr. Hughes, the owner of the house, told the police officers that no one had authority to use the house. At the same time, Peaches told the officers that she had given the partiers permission to use the house. But there were holes in Peaches's story.

Under these circumstances, a reasonable officer could interpret the situation in at least three different ways. *First*, even if Peaches "invited" the partiers to use the house, maybe the partiers still knew that Peaches did not really have lawful authority to use the vacant house. In other words, maybe the partiers were not unwittingly duped by Peaches but instead knew or suspected that Peaches was not renting the house and did not have authority to invite the partiers there. *Second*, maybe the partiers were lying when they said that Peaches had given them permission to use the house, and maybe Peaches then played along and supplied cover for her friends when the officers reached her on the phone. (Did someone from the party text Peaches first to give her a heads-up? Who knows.) *Third*, maybe the partiers were telling the whole truth and were unwittingly misled by Peaches into thinking that she had authority over the house.

In the first two scenarios, a reasonable officer would have probable cause to arrest the partiers for trespassing. In the

third scenario, a reasonable officer would not have probable cause to arrest.

But at the time of the arrests, the officers did not have a way to rule out either of the first two scenarios. After all, a police officer is required to accept a suspect's *mens rea*-related defense only if, among other things, "the facts establishing that defense were so clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs." *Garcia*, 779 F.3d at 93. In this case, the officers had several reasons to doubt that the partiers were telling the truth when they claimed that Peaches had given them permission to use the house. The partiers were in a vacant house late at night without the owner or renter present. The partiers gave conflicting explanations for what they were doing at the house, and about who had supposedly given them permission to be there. The police officers also had several reasons to doubt that Peaches was telling the truth. When the officers contacted Peaches, she refused to come to the house because she said she would be arrested, and she gave conflicting accounts of her authority over the house.

Of course, maybe further investigation would ultimately establish that the third scenario was in fact what had happened. Maybe the partiers had been unwittingly misled by Peaches into thinking that she had authority over the house. But that was not the only reasonable interpretation of the situation at the time of the arrests. And once "a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Amobi*, 755 F.3d at 990 (internal quotation marks omitted).

In short, the officers were required to make an on-the-spot credibility determination in a situation far removed from the serenity and unhurried decisionmaking of an appellate judge's chambers. Under the circumstances, it was entirely reasonable for the officers to have doubts about the partiers' story and to conclude that there was probable cause to arrest the partiers for trespassing. The police officers are entitled to qualified immunity.[5]

### III

The police officers are also entitled to qualified immunity for a second, independent reason. At the time the officers made the arrests here, the arrests violated no clearly established statutory or constitutional right. Any such right was created by the panel opinion in this case – years after the officers made the arrests.

The Supreme Court has stated many times that officers are entitled to qualified immunity unless a plaintiff can show that "the official violated a statutory or constitutional right that was clearly established at the time of the challenged

---

[5] Qualified immunity examines whether police officers' actions are "*objectively* reasonable," not whether police officers *subjectively* believe that their actions are reasonable. *Moore*, 644 F.3d at 423 n.7 (emphasis added) (quoting *Wardlaw*, 1 F.3d at 1305) (internal quotation marks omitted). The District Court's opinion noted that a few of the police officers at the scene "erroneously believed that the question of whether Plaintiffs had been invited onto the property was irrelevant." *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 38 n.15 (D.D.C. 2012). The panel majority's concurrence in the denial of rehearing en banc similarly highlights the officers' subjective beliefs. Concurrence 3, 8-9 & n.1. But because qualified immunity is an objective inquiry, an officer's subjective belief about the law is not relevant to the qualified immunity issue.

conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, slip op. at 12 (2014) (internal quotation marks omitted); *see also Taylor v. Barkes*, 135 S. Ct. 2042, 2044, slip op. at 3 (2015) (summary reversal); *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774, slip op. at 10 (2015); *Carroll v. Carman*, 135 S. Ct. 348, 350, slip op. at 3 (2014) (summary reversal); *Wood v. Moss*, 134 S. Ct. 2056, 2061, slip op. at 2 (2014); *Stanton v. Sims*, 134 S. Ct. 3, 4, slip op. at 3 (2013) (summary reversal); *Reichle v. Howards*, 132 S. Ct. 2088, 2093, slip op. at 5 (2012); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, slip op. at 3 (2011).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 135 S. Ct. at 2044, slip op. at 4 (internal quotation marks omitted). The Supreme Court has emphasized that courts must "define the clearly established right at issue on the basis of the specific context of the case." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, slip op. at 7 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). The Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084, slip op. at 10. "Qualified immunity is no immunity at all if clearly established law can simply be defined" at a high level of generality. *Sheehan*, 135 S. Ct. at 1776, slip op. at 13 (internal quotation marks omitted).

That longstanding rule is one manifestation of the law's general concern about retroactive punishment or liability. *See generally Landgraf v. USI Film Products*, 511 U.S. 244, 265-67 (1994). It would be unfair for a court to impose monetary liability on a police officer by creating a new legal rule and then applying that new rule *retroactively* to punish the officer's conduct. Without "fair notice, an officer is entitled

to qualified immunity." *Sheehan*, 135 S. Ct. at 1777, slip op. at 15 (internal quotation marks omitted). Because "the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Taylor*, 135 S. Ct. at 2045, slip op. at 5 (clearly established precedent must put officials "on notice of any possible constitutional violation"); *Plumhoff*, 134 S. Ct. at 2023, slip op. at 13 ("We did not consider later decided cases" when determining whether an officer violated clearly established law because those cases "'could not have given fair notice'" to the officer.).

At the time of the arrests here, no case had said that officers are required to believe the statements of suspected trespassers who claim that they have permission to be on the property. On the contrary, as explained above, it was and is settled law that officers do not automatically have to believe a suspect's excuses when the officers catch the suspect in the midst of an activity that otherwise appears to be illegal. And in the trespassing context in particular, the most relevant D.C. trespassing cases *supported* arrest in this kind of case. *See Artisst v. United States*, 554 A.2d 327, 330 n.1 (D.C. 1989); *McGloin v. United States*, 232 A.2d 90, 91 (D.C. 1967).

In *Artisst v. United States*, for example, the defendant argued that the evidence was not sufficient for a jury to convict him for trespassing in a Georgetown University dorm. 554 A.2d at 329. Artisst claimed that he had entered the building to buy soccer equipment from a dorm resident and that he therefore lacked the necessary intent to commit unlawful entry. *Id.* The D.C. Court of Appeals upheld the

conviction, finding that a jury could disbelieve Artisst's explanation. *See id.* at 330 n.1. But under the panel opinion here, the police presumably could not even have arrested Artisst, much less a jury have convicted him.

Similarly, in *McGloin v. United States*, the defendant challenged his conviction for trespassing in an apartment building. 232 A.2d at 90. McGloin told the arresting officer that he had entered the building to look for his cat. *Id.* McGloin later told the same officer that he had entered the building to look for a friend. *Id.* The D.C. Court of Appeals upheld McGloin's conviction, noting that although "one who enters for a good purpose and with a bona fide belief of his right to enter is not guilty" of trespassing, this "is not such a case." *Id.* at 91. But again, under the panel opinion here, the police presumably could not even have arrested McGloin, much less a jury have convicted him.

The panel opinion sweeps that D.C. Court of Appeals case law under the rug. The panel opinion does not analyze *Artisst*, and it distinguishes *McGloin* as "merely" recognizing that under certain circumstances, it is "reasonable to infer an interloper's intent to enter against the will of the owner." *Wesby v. District of Columbia*, 765 F.3d 13, 22 (D.C. Cir. 2014).

But the D.C. Court of Appeals case law is on point. In my opinion, that case law clearly *permits* police officers to arrest a person for trespassing even when that person claims to have the right to be on the property, if a reasonable officer could disbelieve the suspected trespasser. If juries in trespassing cases can refuse to credit defendants' explanations for their unlawful presence in buildings, police officers surely can do the same. After all, the standard of proof for convictions is beyond a reasonable doubt, but the standard for

an arrest is the far lesser showing of probable cause. *See Florida v. Harris*, 133 S. Ct. 1050, 1055, slip op. at 5 (2013).

But even apart from those D.C. Court of Appeals decisions, one thing is crystal clear: No decision prior to the panel opinion here had *prohibited* arrest under D.C. law in these circumstances. This should have been a fairly easy case for qualified immunity. Instead, the panel opinion did what the Supreme Court has repeatedly told us not to do: The panel opinion created a new rule and then applied that new rule retroactively against the police officers. The panel opinion held that "in the absence of any conflicting information," officers do not have probable cause to arrest people for trespassing if those people claim that they were invited by "someone with apparent (if illusory) authority." *Wesby*, 765 F.3d at 21. On top of that, the panel opinion added a dubious gloss to its novel rule: Even if a reasonable police officer could have doubted the credibility of the trespassers who claimed to be invitees, those credibility doubts do not count as "conflicting information." What case had ever articulated such a counterintuitive rule? Crickets.

Whatever the merits of the panel opinion's new rule – and I think it is divorced from the real world that police officers face on a regular basis – it is still a new rule. And as the Supreme Court has shouted from its First Street rooftop for several years now, qualified immunity protects officers from personal liability for violating rules that did not exist at the time of the officers' actions. *See, e.g.*, *Sheehan*, 135 S. Ct. at 1777, slip op. at 15; *Plumhoff*, 134 S. Ct. at 2023, slip op. at 13-14; *Stanton*, 134 S. Ct. at 7, slip op. at 8.[6] The police

---

[6] To be sure, "in an obvious case," general constitutional principles "can clearly establish the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199 (internal quotation marks omitted). For example, the Supreme Court concluded that

officers in this case did not violate clearly established law when they arrested the partiers. The officers are entitled to qualified immunity.[7]

---

handcuffing a prison inmate to a hitching post for seven hours in the sun and without water was an "obvious" violation of the Eighth Amendment's prohibition on cruel and unusual punishment. *Hope v. Pelzer*, 536 U.S. 730, 738, 741 (2002). But the case before us now is hardly an "obvious" case of unconstitutionality. Arresting partiers late at night in a vacant house for trespassing when police officers could reasonably doubt that the partiers had authority to use the house is far from an "obvious" violation of constitutional rights by police officers.

[7] The plaintiffs brought suit against the police officers not only under Section 1983 but also under D.C. law. Under D.C. law, a police officer is not liable for the tort of false arrest if the police officer had probable cause to make the arrest, or "if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable." *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (alteration in original) (internal quotation marks omitted). Under D.C. law, then, a police officer is entitled to immunity from a false arrest suit if the officer both (i) *reasonably could have believed* that there was probable cause to arrest and (ii) *subjectively believed in good faith* that there was probable cause to arrest. As the D.C. Court of Appeals has held, that "standard resembles the section 1983 probable cause and qualified immunity standards," with "the added clear articulation of the requirement of good faith." *District of Columbia v. Minor*, 740 A.2d 523, 531 (D.C. 1999).

This opinion has analyzed the objective aspect of the standard. As to the subjective aspect, the two defendant police officers in this case, Officers Parker and Campanale, believed in good faith that they had probable cause to make the arrests because the officers were unable to definitively determine if the partiers were telling the truth when they claimed to have permission to use the house. Officer Parker indicated that the officers made the arrests because "one person said" that the partiers "didn't have the right" to use the

22

* * *

The qualified immunity doctrine affords police officers room to make reasonable judgments about whether they have probable cause to make arrests. The Supreme Court has emphasized that the doctrine protects all but the plainly incompetent or those who knowingly violate clearly established law. The officers in this case were not plainly incompetent, nor did they knowingly violate clearly established law. Anything but. Even if the officers ultimately were wrong in concluding that they had probable cause (and I do not think they were wrong), it was at least reasonable for the officers to believe that they had probable cause under the circumstances and applicable law. They should not be subject to $1 million in damages and fees for their on-the-spot decision to make these trespassing arrests. To be sure, I do not dismiss the irritation and anguish, as well as the reputational and economic harm, that can come from being arrested. Police officers should never lightly take that step, and the courts should not hesitate to impose liability when officers act unreasonably in light of clearly established law. But that is not what happened here, not by a long shot. I respectfully dissent from this Court's decision not to rehear this case en banc.

---

house, and "one person said" that the partiers "did have the right" to use the house. Deposition of Officer Parker, J.A. 99. Officer Campanale similarly stated that the officers arrested the partiers because "[n]obody could determine who was supposed to be inside the residence," and because the partiers were "present inside of a location that" the partiers did "not have permission to be in." Deposition of Officer Campanale, J.A. 124.